**Jane DOE, Plaintiff, Appellee,**

v.

**TRAVELERS INSURANCE COMPANY, Defendant, Appellant.**

No. 98–1286.

United States Court of Appeals, First Circuit.

Jan. 27, 1999.

Joan O. Vorster with whom James C. Donnelly, Jr., Charles B. Straus, III, and Mirick, O'Connell, DeMallie & Lougee, LLP were on brief for appellant

Katherine A. Hesse with whom David W. Healey, Doris R. MacKenzie Ehrens and Murphy, Hesse, Toomey & Lehane were on brief for appellee.

Before SELYA, Circuit Judge ALDRICH, Senior Circuit Judge, BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

Travelers Insurance Company ("Travelers") appeals from a judgment against it in favor of Jane Doe (a pseudonym) for claims she brought in the district court under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The events giving rise to Doe's law suit and the proceedings that ensued can be briefly summarized as follows.

In 1995, Jane Doe was the founder, chairperson and chief technical officer of a high tech firm. During the prior two years, she had been getting outpatient psychotherapy for depression. In January 1995, she attended a women's retreat where, she later said, she experienced a rush of repressed memories of childhood sexual abuse. Following this experience, Doe was afflicted by an increased sense of disquiet and depression, had trouble sleeping and eating, and suffered from repeated sudden floods of images and memories.

According to her medical records, Doe engaged in some self-destructive behavior between the retreat and the end of February. Once she wandered off into the snow for several hours at night. She overdosed on codeine at one point, had urges to cut herself, and formed some thoughts of suicide (the clinical phrase is "suicidal ideation") centering upon codeine overdosing. Her depression grew more severe during late February. On March 1, Doe nearly had an automobile accident when she had a "flashback" while driving at high speed.

At the urging of her psychiatrist, Dr. Nicholson Browning, Doe contacted the Human Resource Institute Hospital on February 23, 1995, with a view to possible hospitalization. Doe's company had an employee benefit health plan that comprised or included medical coverage under a policy issued by Travelers. The Travelers policy included inpatient hospital care for mental health needs, where justified under the policy, for up to 60 days subject to a 20 percent co-payment by the beneficiary. Apparently there followed some discussion between the hospital and Travelers that led Doe to believe that Travelers would likely cover her hospitalization and that the hospital would waive Doe's share.

On March 1, 1995, Doe asked Travelers to approve her admission to the hospital, which she entered on March 2. A three-page single spaced "admission note," compiled by Dr. Lisa Wolfe, the psychologist involved in Doe's care, concluded in "reason for hospitalization": "Deteriorating condition unmanageable outside of a hospital setting and serious suicide risk." Doe's treating psychiatrist, Dr. Nan Herron, also said that inpatient care was necessary and later supplied hospital notes covering the first several weeks of March that referred to suicidal gestures and impulses on Doe's part.

On March 3, a Travelers' representative acting as "patient advocate" advised Doe's doctors orally that Travelers would not approve inpatient treatment.[1] The internal notes of the patient advocate indicate as reasons that there had been no suicidal ideation since Doe's hospitalization (a one-day period) and that she had been willing to "contract" for her safety with the hospital—apparently a commitment secured by the hospital from patients where possible—and that she had been admitted to an "open" unit subject to checks by hospital staff only every 15 min-

---

1. The Travelers' plan that covered Doe defines the "Patient Advocate" as a "program which performs a Utilization Review for the Company." The plan only covers charges for services deemed "medically necessary" by the patient advocate.

utes—as opposed to close confinement or more frequent monitoring.

Doe remained in the hospital, paying out of her own pocket but insisting that Travelers reimburse her. Doe's doctors and psychologist wrote to Travelers and supplied more details and arguments for reimbursement. Travelers' patient advocate and a series of other Travelers personnel wrote letters in reply and consulted with physician advisors and medical reviewers who advised Travelers based on records as to Doe; the gist of these statements was that Doe's symptoms and the hospital's willingness to let her out of the hospital for brief daytime "leaves" showed that outpatient treatment was a feasible and obviously less costly alternative approach. The correspondence continued after Doe completed her inpatient treatment on or about March 20.

Ultimately, in May 1995, Travelers agreed to pay for the first two days of hospital treatment but not the balance. After further refusals of Travelers to pay more, Doe filed suit in a Massachusetts state court against Travelers for breach of contract and deceptive acts and practices. Travelers removed the case to federal district court where it has been treated, without dispute by the parties to this appeal, as one governed directly by ERISA. *See Doe v. Travelers Ins. Co.,* 971 F.Supp. 623, 629 (D.Mass.1997). After discovery and a four-day non-jury trial, the district court decided the case on July 31, 1997, in favor of Doe. *See id.* at 639–41.

The district court concluded that Travelers' handling of Doe's claim had been flawed by procedural errors and by Travelers' improper delegation of authority to handle claims to other entities; that Doe had at least a colorable case for reimbursement; that reconsideration by Travelers was infeasible because it no longer retained authority to decide claims; and that therefore Doe should be reimbursed the amount of her unpaid hospitalization costs of $23,456.04. *See Travelers,* 971 F.Supp. at 641. The court also found that Travelers had violated ERISA by failing to supply Doe with certain mental health guidelines it had used in considering her claim and imposed $38,000 in penalties. *See id.* at 640.

The district court also concluded that it should award attorney's fees and costs in favor of Doe. *See id.* at 641. In later proceedings, it fixed the amount at $155,705.92 in fees and $1,264.70 in costs. Thereafter, a final judgment, which also provided for post-judgment interest, was entered covering hospital reimbursement, penalties, and attorney's fees and costs. Travelers now appeals, challenging every portion of the judgment.

It is common ground that Doe's rights against Travelers under the policy are governed by ERISA and not by state law. *See id.* at 629. Under ERISA, a plan beneficiary such as Doe may bring a civil action "to recover benefits due" under the plan or to enforce "rights" under the plan. 29 U.S.C. § 1132(a)(1)(B). Travelers concedes that under 29 U.S.C. § 1002(21), it has assumed a fiduciary responsibility to pay benefits due under the policy. *See Travelers,* 971 F.Supp. at 629. The first question we face is whether Doe is entitled to reimbursement under the policy in this case.

What is "due" to Doe under the policy is, in the first instance, defined by the terms of the policy. Under the policy, Doe is covered for hospitalization of the type in question—it is listed as one of the treatments available—but only if it is "medically necessary." The policy provides that Travelers "determines, in its discretion, if a service or supply is medically necessary," including consideration of whether "a less intensive" treatment would accomplish the task. Later language says that "[n]o benefits are payable unless the Patient Advocate determines the services are Medically Necessary."

Although the "discretion" and "no benefits" language could be read literally to make Travelers' decision final, Travelers quite sensibly does not take this extreme position. It says only that it is entitled to have its own decision reviewed deferentially, under an arbitrary and capricious standard, based on the information it had available when it made its decision. At first blush, the standard of review urged by Travelers is just what the Supreme Court endorsed in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), for ERISA

benefit determinations where, as here, the plan language purports to reserve to the defendant discretion in administering the provisions in question.

*Firestone* did note that where the plan fiduciary exercising the discretion operates under "a conflict of interest," this is a "factor" in determining whether discretion has been abused. *Id.* at 115, 109 S.Ct. 948. What constitutes a conflict and how the factor is to be weighed were not explained, and naturally the cases in the lower courts are now somewhat divided.[2] Here, of course, Travelers would pay the claim out of its own assets, a position the district court viewed as producing a conflict of sorts. *Travelers,* 971 F.Supp. at 630. Travelers says it is a very small claim payable out of very large assets; but small claims add up. On the other hand, Travelers can hardly sell policies if it is too severe in administering them.

The district court predicted that this circuit would adopt a standard for companies in Travelers' position that afforded the company latitude but gave "more bite" to the arbitrary and capricious standard, a notion suggested by a Seventh Circuit case. *Chojnacki v. Georgia–Pacific Corp.,* 108 F.3d 810, 815 (7th Cir.1997). Thereafter, a panel of this court cited the "more bite" language with approval but then glossed it in terms that would make it inapplicable here. *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998). *Doyle* stressed the benefit of a uniform test of discretion and concluded that the mere fact that an individual claim, if paid, would cost the decision maker something did not show that "the decision was improperly motivated." *Id.*

■ It seems to us that the requirement that Travelers' decision be "reasonable" is the basic touchstone in a case of this kind and that fine gradations in phrasing are as likely to complicate as to refine the standard. The essential requirement of reasonableness has substantial bite itself where, as here, we are concerned with a specific treatment decision based on medical criteria and not some broad issue of public policy. Any reviewing court is going to be aware that in the large, payment of claims costs Travelers money. At the same time, the policy amply warns beneficiaries that Travelers retains reasonable discretion based on medical considerations.

Consistent with *Doyle,* 144 F.3d at 184, we do not think that Travelers' general interest in conserving its resources is the kind of conflict that warrants *de novo* review. Nor is it necessary to consider Doe's position, reinforced by some comments of the district judge, that *de novo* review is appropriate in this case—apart from any alleged conflict of interest—because of other procedural errors by Travelers or improper delegations of authority by it to others. We by-pass these latter concerns by assuming that review is merely for reasonableness and by concluding that even under this favorable standard Travelers' denial of benefits, tested against the relevant record, was unreasonable in this case.

■ This brings us to the question of what "record" should be used in judging the reasonableness of Travelers' decision. It is not clear that any single answer covers all of the variations in ERISA cases; the "record" may depend on what has been decided, by whom, based on what kind of information, and also on the standard of review and the relief sought. Here, we will assume *arguendo,* in Travelers' favor, that Travelers could sustain its denial if it acted reasonably based on the information in its possession available from Doe and from other sources, and that new previously unavailable medical evidence from

**2.** *See, e.g., Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir.1997) (finding conflict and reviewing decisions *de novo* ); *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323 (9th Cir.1995) (presuming conflict and shifting burden of proof to insurer); *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566–67 (11th Cir.1990) (same); *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 824–27 (10th Cir.1996) (adopting sliding scale approach); *Doe v. Group Hospitalization & Med. Serv.,* 3 F.3d 80, 87 (4th Cir.1993) (same); *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 638–42 (5th Cir.1992) (same); *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1052–53 (7th Cir.1987) (same); *Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251, 1255 (2d Cir.1996) (burden on plaintiff claimant to prove conflict improperly motivated decision).

Doe offered for the first time at trial would not impeach the original decision.

Finding out just what information Travelers had and why it acted as it did depends upon the medical notes provided to it, the exchange of correspondence, and the recollections of oral conversations; this in turn can require discovery and even fact finding by the district court. Here, however, the parties have stipulated to, or otherwise left undisputed, facts or documents sufficient to resolve the case. Doe continued to pursue her case administratively well into the summer, and Travelers gives us no reason to ignore information Doe offered to Travelers *before* her last appeal was rejected in August 1995.[3]

■ The district court opinion describes, chronologically, much of the back and forth in March 1995 and thereafter, and quotes at length from the medical log of Travelers' patient advocate. Instead of repeating the story in the same detail and manner, we extract the essentials on each side and consider them, in particular, against the more general criteria of the mental health "guidelines" on which Travelers itself said it relied in making its decision.

On Doe's side of the scale, it is evident that Doe was significantly anxious and depressed before entering the hospital. This claim of mental disturbance is plausibly explained by Doe's prior history, and was confirmed by her outside psychiatrist and by the medical staff at the hospital after she entered. Her records indicate a downward trend in her condition in late February 1995. Doe's own doctor urged her to seek hospital care. Nonetheless, if this evidence stood alone, Travelers might have had reason to insist that Doe first exhaust the possibility of outpatient treatment.

The gravamen of Doe's claim is the danger of suicide—that she had engaged in some self-destructive behavior and had, both be-fore entering the hospital and afterwards, some thoughts about self-mutilation and suicide. Here, we deal with matters of degree: she had not leapt from a balcony or tried to shoot herself, and there is no clear evidence that she had the kind of very detailed and consistent plans for suicide that would cause the most severe level of alarm. At the same time, her documented impulsiveness certainly created a danger, even if more qualified than a well-developed plan, that she might harm herself in a wave of despair or distraction.

It is much harder to calibrate such risks than to diagnose conditions that can be reduced to blood samples, EKG print-outs, or biopsies—and that, in turn, requires that we give special weight to the judgment of trained experts who saw and treated Doe. The opinions of her own doctor, the hospital doctor, and the hospital psychologist were unanimous that Doe did have suicidal thoughts, that they created a discernible risk that she would act on them, and that a period of inpatient care was necessary. The hospital notes for most of the period of Doe's hospitalization continue to reflect concerns about suicide or self harm. A significant risk of death is, of course, the ultimate medical danger.[4]

On Travelers' side of the balance, it appears that the patient advocate did confer with one or more of Travelers' own consulting psychiatrists, who concurred in the advocate's denial of approval. However, Travelers' doctors did not examine Doe, their reasoning is not known in detail, and Travelers eventually conceded that cause existed to justify two days of inpatient evaluation, an evaluation that led the hospital to continue to press for inpatient care. The only objective evidence cited by Travelers is that Doe's confinement within the hospital was less severe than it might have been and that she was allowed out for portions of some days "on leave"; but these choices were nec-

---

3. Travelers complains that in her appellate brief Doe relies upon information that Travelers never had and may not even be true. We pass by this issue by relying upon the information that Travelers did have and the reasoning reflected in its own medical records.

4. This is dramatically illustrated by cases in which treatment was not offered and suicide followed. *See, e.g., Tolton v. American Biodyne, Inc.,* 48 F.3d 937 (6th Cir.1995); *Lazorko v. Pennsylvania Hosp.,* 1998 WL 405055 (E.D.Pa.); *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49 (D.Mass.1997).

essarily based on judgments as to Doe's day-to-day condition.

The written mental health guidelines that Travelers purported to rely upon come very close to embracing the facts of this case.[5] Two separately sufficient conditions for acute inpatient care are: "recent suicide attempt and/or serious gesture with specific plan— and means indicating current suicidal risk" and "[c]urrent suicidal ideation and plan with a history of previous suicide attempts, serious gestures...." Either of this pair of conditions constitutes "severe" impairment and justifies inpatient hospitalization. The guidelines go on to make clear that even "moderately severe" or "moderate" impairment (e.g., "history of [suicidal] gestures and/or attempts with or without a specific plan") can justify inpatient treatment depending on the circumstances.

Given the stakes, the objective evidence of Doe's "gestures," her plausible persistent claims of suicidal thoughts (accepted as authentic by her doctors), her undoubtedly fragile mental condition, the unanimity of expert opinion on the part of those who examined and treated Doe that inpatient care was required, and Travelers' own guidelines, we think that the denial of full benefits was unreasonable. This conclusion eliminates any concern about procedural flaws, delegations, remands or abandonment of authority to revisit the case. Travelers is simply responsible under the policy for the treatment as "medically necessary."

By contrast, we do not agree that Travelers—by failing to tender to Doe a copy of the mental health guidelines—violated ERISA's requirement that any plan administrator must furnish, on request and within 30 days, "any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary...." 29 U.S.C. § 1132(c).[6] The district court said that Doe had requested the guidelines by letter of June 21, 1995, that the guidelines fell within the category of information that a plan administrator is required by statute to furnish on request within 30 days, and that Travelers had not furnished the guidelines to Doe until discovery in this case on August 6, 1996. See Travelers, 971 F.Supp. at 639–40. The court therefore imposed the section's discretionary penalty of $100 per day for failure to comply starting 30 days after July 22, 1995, or $38,-000. See id. at 640–41.

As background to the legal issue, some additional facts are pertinent. The first letter from Travelers to Doe, dated March 7, 1995, said inter alia that the initial denial of inpatient treatment was made "[p]ursuant to the Travelers' Medical Necessity Guidelines" because the patient's "clinical situation" showed that treatment could be rendered in "a less intrusive or more appropriate alternative setting." Later, more detailed correspondence from Travelers dealt with clinical information concerning Doe but did not refer again to any specific guidelines.

In the course of discovery, Travelers was forced to produce the document titled "Guidelines for Level of Care Decisions in Mental Health Care," see note 5, above, saying that this was the "Travelers' Medical Necessity Guidelines" to which its original March 7 letter referred. The document would likely have been quite helpful to Doe and her doctors in arguing for inpatient treatment, but the document itself cautions that treatment decisions depend upon "many factors, only some of which can be generalized in the form presented here."

This brings us back to the statute and regulations. Section 1024 requires that the administrator furnish each beneficiary, at the outset and later upon request, the summary plan description and, upon request, "the trust agreement, contract or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(2). Elsewhere, the statute says that "the plan description and

---

5. These guidelines are a multi-page technical document, titled "Guidelines for Level of Care Decisions in Mental Health Care," describing symptoms warranting particular kinds and levels of treatment. The author is not identified.

6. Travelers says it is not named as administrator in any plan, and therefore Doe's company itself (as the plan sponsor) is technically the administrator. See 29 U.S.C. § 1002(16)(A)(ii). However, Travelers told the district court that it was the administrator, and we will assume arguendo that this was so.

summary plan description" shall include *inter alia* "the plan's requirements respecting eligibility for participation and benefits" and "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). *See also* 29 C.F.R. § 2520.102–3(*l*); 29 C.F.R. § 2520.102–3(j)(2).

We do not think that the mental health guidelines are one of the "other instruments," a phrase that in context refers to the formal legal documents that underpin the plan.[7] And while the statute's "requirements" and "circumstances" language might be stretched to cover the document, this language is more reasonably directed to provisions such as those contained in the policy itself that describe the plan and legally obligate Travelers—with respect to the medical conditions covered, these provisions include the general test of medical necessity, the claims procedure, and like information that a beneficiary would normally consult in determining what protection was afforded by a plan. *See Faircloth,* 91 F.3d at 653–54; *Hughes,* 72 F.3d at 690–91.

The mental health guidelines may have been used by Travelers, but Travelers was not bound to use them, nor did patients have any legal rights under them. Travelers could consult or disregard this or any other set of mental health guidelines, medical textbooks, articles, or advisors in making its judgment. To hold that Travelers' choices, from this broad and changeable menu, become part of the plan stretches the statutory language too far. The courts have understandably been cautious in reading too broadly disclosure requirements whose violation can trigger a $100 per day penalty, conceivably available to many plan participants and beneficiaries.[8]

The district court also relied upon a provision, not of ERISA but of the regulations under it, relating to claim procedures.

*See Travelers,* 971 F.Supp. at 632. This regulation requires every plan to have a procedure for appealing a denied claim to a fiduciary or its delegate and "under which a full and fair review" may be obtained, including the opportunity to "review pertinent documents." 29 C.F.R. § 2560.503–1(g). The district court ruled that Doe's June 21, 1995, letter—asking for "a copy of the medical reviewers['] report"—was a "request" for the mental health guidelines and triggered Travelers' duty to produce the guidelines as a "pertinent" document needed for "full and fair review."

We pass by the question whether ERISA's $100 penalty provision applies to material required solely because of an ERISA regulation (section 1132(c)(1) speaks of information required "by" the statute). Even if the penalty provision did apply in principle—a debatable issue—a request for "the medical reviewers['] report" is not a request for the guidelines. Nor do we think that Doe's general request for an explanation required the production of the guidelines as an essential part of Travelers' obligation to supply an explanation for its decision under 29 C.F.R. § 2560.503–1(f).

This does not mean that the failure to provide "a full and fair review" required by the regulations is without consequences or that no "pertinent document" need ever be produced for such a review without a specific reference. The district court thought the denial of Doe's claim flawed by just such missteps in this case—an issue we have found it unnecessary to reach. *See Travelers,* 971 F.Supp. at 632–34. Similarly, the regulations can be enforced by the Secretary. *See* 29 U.S.C. §§ 1132(a)(2), (a)(4–6). But the $100 per day penalty is limited to those cases where the conduct falls squarely within the terms of section 1132(c). *See Verkuilen,*

7. *See Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 653 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997); *Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non–Bargaining Retirement Plan,* 72 F.3d 686, 690–91 (9th Cir.), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

8. *See Groves v. Modified Retirement Plan,* 803 F.2d 109, 117–19 (3d Cir.1986); *see also Verkuilen v. South Shore Bldg. & Mort. Co.,* 122 F.3d 410, 412 (7th Cir.1997); *Anderson v. Flexel, Inc.* 47 F.3d 243, 248 (7th Cir.1995).

122 F.3d at 412; *Anderson,* 47 F.3d at 248; *Groves,* 803 F.2d at 117–19.

 Finally, we turn to Travelers' appeal from the award of attorney's fees against it. Under ERISA, the district court "in its discretion may allow a reasonable attorney's fee and costs" to either party (the award is mandatory only in a narrow and here irrelevant class of cases). 29 U.S.C. 1132(g)(1); *see also Lodge v. Shell Oil Co.,* 747 F.2d 16, 20–21 (1st Cir.1984). Naturally, such awards are normally for the prevailing party, if at all, and are based on rather general considerations such as fault, ability to pay, deterrence, and the like. *See Gray v. New England Tel. and Tel. Co.,* 792 F.2d 251, 257–58 (1st Cir.1986). In this case the district court wrote a thoughtful separate opinion explaining its reasons for awarding fees in favor of Doe.

 Nevertheless, we must remand the award of attorney's fees because the amount allowed rested in part on the size of the award to Doe, and we have now struck the penalty component of the award. If anything in our opinion prompts the district court to reconsider whether any award should be made, it is free to do so. But we do not suggest that the district court needs to conduct any further proceedings before deciding these issues.

The award of hospitalization benefits including pre- and post-judgment interest *is affirmed;* the award of penalties for nondisclosure is *reversed;* and the award of attorney's fees and costs is *vacated* and *remanded* for further proceedings consistent with this opinion. Each party shall bear its own costs on this appeal, and Doe's request for attorney's fees on this appeal is denied.

*It is so ordered.*