**Judi RISENHOOVER, Plaintiff,**

v.

**BAYER CORPORATION GROUP HEALTH PLAN, Bayer Corporation and Connecticut General Life Insurance Company, Defendants.**

No. 00 Civ. 0104.

United States District Court, S.D. New York.

Feb. 9, 2000.

Gruen & Farrelly, LLP, Michael S. Gruen, New York City, for Plaintiff.

Wormser, Kiely, Galef & Jacobs, LLP, John T. Morin, New York City, for Defendants Bayer Corporation and Bayer Corporation Group Health Plan.

Harvey, Pennington, Cabot, Griffith & Renneisen, LLC, Kevin G. Horbatiuk, Philadelphia, PA, for Defendant Connecticut General Life Insurance Company.

Brian P. Conway, for Defendant Bayer Corporation.

*OPINION AND ORDER*

OWEN, District Judge.

Before me is the issue of an employer's obligation under a welfare plan to reimburse an employee for expensive medical treatment which the employee's treating doctor has prescribed, but which the employer's reviewing physicians do not find "medically necessary". Plaintiff Judi Risenhoover brings this suit under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., to enjoin defendants Bayer Corporation Group Health Plan, Bayer Corporation ("Bayer"), and Connecticut General Life Insurance Company from discontinuing reimbursement to her under the Bayer Corporation Group Health Plan (the "Plan") for an intravenous antibiotic treatment prescribed by her treating physician. Plaintiff now moves for a preliminary injunction requiring the defendants to continue reimbursement for the IV treatment. I should note that the term "reimbursement" here is somewhat of a misnomer, for without the Plan's payment, plaintiff has not the resources to pay for the treatment herself.

Plaintiff, a forty year old woman, has been seriously ill for some twenty one years. Over the years, a number of physicians have diagnosed various illnesses and treated her without success.[1] She has been an employee of defendant Bayer Corporation since 1994, and is covered under its welfare Plan. The Plan covers only "eligible expenses," and it is only these for which the Plan will reimburse. As the Plan provides, "[t]o be an eligible expense, every treatment, service or supply must be a medical necessity." (Pl.'s Ex. DD). "A treatment, service, or supply is usually a 'medical necessity' if it is … consistent and appropriate for the condition."[2] (*Id.*).

In March 1997, Dr. Fred Pescatore diagnosed plaintiff with Lyme Disease, and prescribed for her a regime of intravenous antibiotic therapy. Due to an adverse reaction, this IV treatment was stopped in July 1997. In October 1997, plaintiff began seeing Dr. Kenneth B. Leigner who also diagnosed her with Lyme disease. Dr. Leigner sought pre-approval for the same IV antibiotic treatment in December 1997. Bayer agreed to reimburse, and permitted treatment to begin in September 1998—more than nine months later. Meanwhile, in June 1998, plaintiff began to work only part time because of her illness. The course of IV treatment started in September continued for six weeks, was interrupted for about two weeks because of cancellation of insurance approval, and was then reinstated upon subsequent approval. However, in March 1999, while the treatment was continuing, plaintiff became unable to work at all, and went on paid medical leave. The reimbursed treatment continued until June 1999, when plaintiff developed ·an infection which necessitated its cessation. On September 14, 1999, Dr. Leigner wrote plan administrator Connecticut General requesting pre-

---

1. Her illness has been variously diagnosed as lupus, polymyositis, dermatomyositis, fibromyalgia, epileptic seizures, and migraines. (Risenhoover Aff. ¶ 14).

2. There are other "categories" of medical necessity, (*see id.*), but plaintiff concedes that "[f]or present purposes, only … 'consistent and appropriate for the condition'" applies. (*See* Pl.'s Mem. of Law in Supp. at 8).

approval for reinstatement of treatment. Connecticut General did not respond until October 27, 1999, when it requested plaintiff's complete medical records going back to the beginning of 1998. At this time, defendants agreed to reimburse for the requested treatment during the continued pendency of their deliberations, with the understanding that defendants would not thereby acknowledge medical necessity although either party could cite the consequences of treatment as proof or disproof of its efficacy. Accordingly, plaintiff recommenced reimbursed treatment on November 22, 1999.

On December 15, 1999, Bayer faxed a letter to plaintiff's counsel advising that reimbursement would be terminated immediately. On December 16, plaintiff's counsel requested that Bayer provide, among other things, a copy of the evaluation cited in the December 15 letter. Plaintiff received a redacted copy of the consultant's report on January 4, 2000. Plaintiff commenced this suit on January 6, 2000 under ERISA, 29 U.S.C. § 1001 et seq., to enjoin defendants from their discontinuance of reimbursement under the Plan for the IV treatment. On January 7, 2000 I granted a TRO continuing reimbursement for the treatment pending Court consideration. Before me now is plaintiff's motion for a preliminary injunction to require defendants to continue reimbursement for the IV antibiotic treatment. For the reasons set forth below, plaintiff's motion is denied.

■ It is well established in this Circuit that a preliminary injunction requires a showing of (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions about the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999). Where a plaintiff seeks a preliminary injunction that would in effect grant the ultimate relief, plaintiff must show a "substantial" likelihood of success on the merits and make a "strong" showing of irreparable harm if the preliminary injunction is not granted. *See Pazer v. New York State Bd. of Law Exam'rs*, 849 F.Supp. 284, 286 (S.D.N.Y.1994).

To determine whether plaintiff has established a substantial likelihood of success on the merits, I must examine the basis for defendants' decision to deny coverage viewed against the Plan. At the outset, it should be observed that one who goes to work for a company is subject to whatever plan, if any, the employer has, and that must be expressly stated so the employee is aware of the plan's conditions which are part of the employment relationship. For the employer to have discretionary authority to determine eligibility for benefits, the plan must so state. If that discretion is to be delegated to another organization, the plan must so state.

Under *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a court must review de novo the denial of benefits under an ERISA-regulated plan "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which event the administrator is to be sustained on Court review unless there is a showing that the administrator was arbitrary and capricious. Here, plaintiff acknowledges that the Plan gives Bayer such discretionary authority. The Plan Summary states that "Bayer Corporation shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions by general rule or particular decision." (Pl.'s Ex. DD.) Plaintiff, however, while conceding that Bayer has discretionary authority, (Pl.'s Mem. of Law in Supp. at 13), con-

tends that Connecticut General, to whom Bayer delegated decisions regarding benefits eligibility, was not, under the Plan, given Bayer's discretionary authority, and therefore the de novo standard of review applies to Connecticut General's determination here.

ERISA does permit a named fiduciary, such as Bayer, to delegate authority and responsibility to persons other than the named fiduciary. 29 U.S.C. § 1105(c)(1)(B). Delegable authority and responsibility may include that "authority and responsibility to exercise discretion in making decisions regarding benefits eligibility." *Doe v. Travelers Ins. Co.*, 971 F.Supp. 623, 634 (D.Mass.1997), *aff'd in part, rev'd in part*, 167 F.3d 53 (1st Cir. 1999); *see Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1283–84 (9th Cir.1990). In order for a delegation to be effective such that the arbitrary and capricious standard of review will apply, the fiduciary must properly designate in the plan the delegatee of the fiduciary's discretionary authority. This is apparently bottomed on the reasoning that this is but one of many terms of employment the employee is entitled to know of or at least be on notice of. *Davidson v. Liberty Mut. Ins. Co.*, 998 F.Supp. 1, 8–9 (D.Me.1998).

■ Here, I find that Bayer properly delegated its discretionary authority to Connecticut General. Section 9.3 of the Plan reads "[Bayer] may appoint one or more individuals and delegate such of its power and duties as it deems desirable to any individual ... [s]uch individuals shall be officers of other employees of the Employers and such other persons and [Bayer] may appoint." Article 9.4 further provides that "all findings of fact, determinations, interpretations, and decisions of the Company or its delegee shall be conclusive and binding." Bayer's Plan Summary also indicates that Connecticut General is the delegatee of its discretionary authority, as it lists Connecticut General as "Claims administrator and/or plan

trustee." (Pl.'s Ex. DD). This language is sufficient to confer Bayer's discretionary authority on Connecticut General. *See Steinmann v. Long Term Disability Plan of the May Dep't Stores Co.*, 863 F.Supp. 994, 999–1000 (E.D.Mo.1994) (finding language conferring general responsibility including power to interpret and construct plan sufficient to confer discretionary authority upon delegatee).

I find plaintiff's reliance on *Doe* and *Davidson* unpersuasive, as both cases are easily distinguishable. In *Davidson*, 998 F.Supp. at 9, the court was not provided with a plan provision permitting delegation of fiduciary duties. Thus, because the existence of such a provision could not be assumed, the court held that the delegation of discretionary authority was not proper and the de novo standard applied. *Id.* In *Doe*, 971 F.Supp. at 635, the fiduciary also failed to point to a plan provision that allowed a fiduciary to delegate fiduciary duties. Moreover, the court found that the delegatee was not disclosed to plaintiff, as the letters to her were still on the fiduciary's letterhead, not the delegatee's. *Id.* Plaintiff simply had no idea, until discovery, that the decision making authority had been transferred. *Id.* Here, the Plan does contain language permitting delegation of the fiduciary duties. In addition, Risenhoover does not contend that she did not know who was making the decisions. In fact, the Plan Summary set forth and thereby alerted her to Connecticut General's role as "[c]laims administrator and/or plan trustee." (Pl.'s Ex. DD). Accordingly, Bayer properly delegated its discretionary authority to Connecticut General.

■ Plaintiff also argues that due to the assertion of a conflict of interest—namely, that the Plan is self-insured, and Bayer pays benefits, at least in part, from company assets—the decision to deny reimbursement is accorded significantly reduced deference. *See Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 476–77 (2d Cir.1997) (quoting *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251,

1255–56 (2d Cir.1996)). However, plaintiff has not demonstrated that an actual conflict of interest affected and influenced a determination made by Bayer, *id.*, because Connecticut General, *not* Bayer, made the determination. Accordingly, because Bayer properly delegated its discretionary authority to Connecticut General and plaintiff has not shown that a conflict of interest affected the reasonableness of Connecticut General's decision to deny reimbursement, *see id.*, the arbitrary and capricious standard of review continues to apply.

■ Under this standard, Connecticut General's decision will stand unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995) (quotation omitted). On this record, Connecticut did not act arbitrarily or capriciously in denying plaintiff reimbursement. Its decision was reasonable, supported by substantial evidence, and not erroneous as a matter of law.

Plaintiff contends that Connecticut General merely "rubber-stamped" the conclusion of a consultant's determination in denying coverage. However, declarations submitted by the defendants show that Connecticut General relied on substantially more than the one report. (*See* Fleisher Decl. ¶ 35; Carter Decl. ¶¶ 12–15). On four separate occasions, Connecticut General had plaintiff's claims examined by outside medical experts who specialize in the treatment of Lyme Disease. Dr. Robert Schoen evaluated plaintiff's case file twice—on March 2, 1998 and November 30, 1999.[3] In both evaluations, he concluded that plaintiff did not have Lyme Disease, and therefore the antibiotic treatment was not indicated. (Morin Decl. Ex. F). Dr. Peter Welch conducted an Independent Medical Examination of Plaintiff on April 29, 1998. In his May 7, 1998 report, he concluded that is was "very unlikely" that Plaintiff suffers from Lyme disease and that is was "highly unlikely" that there would be "any permanent benefit to another episode of. intravenous antibiotic treatment." (*Id.* Ex. C). Dr. Brian S. Schwartz also conducted and Independent Medical Exam of plaintiff on June 23, 1999, and concluded in his June 28, 1999 report that although he believed that plaintiff had Lyme disease at one time, she had "an adequate trial of IV antibiotics," and that "ongoing antibiotics could potentially do her more harm than good." (*Id.* Ex. E).

Even plaintiff's treating physician, Dr. Leigner, is guarded, not taking a flat-out position that plaintiff has Lyme disease, and that the IV treatment is mandatory.[4] He has stated some tentativeness in his diagnosis, and acknowledges that the length of IV treatment is the subject of legitimate difference of opinion and is a question of medical judgment. (Leigner Decl. ¶¶ 4, 8–10, 12, 27). It is also clear that Lyme disease may be difficult to diagnose, and particularly so in this case, where over the years plaintiff's condition was "variously diagnosed as lupus, polymyositis, dermatomyositis, fibromyalgia, epileptic seizures, migraines and otherwise." (Risenhoover Aff. ¶ 14; *see* Leigner Decl. ¶ 4). This is confirmation of the Court's essential conclusion that of Doctors Schoen, Welch, and Schwartz were not unreasonable in their conclusions. As a result, Connecticut General's denial of coverage is not unreasonable, let alone arbitrary and capricious, as it was based on the opinions and conclusions of these doctors who concluded that either plaintiff does not have Lyme disease, or the IV antibiotic treatment is no longer appropriate.[5]

---

3. Schoen's November 30, 1999 report was the evaluation that was redacted and provided to plaintiff's counsel on January 4, 2000.

4. Indeed, it is also worth noting that although plaintiff contends that the IV antibiotic treatment is beneficial to her health, she was forced to stop working entirely while on the treatment.

Thus, I find that plaintiff falls quite short of establishing a substantial likelihood of success on the merits, because she has not put into any question that the decision to deny reimbursement under the Plan was arbitrary or capricious, unsympathetic as its effect appears to many, if not all. Accordingly, plaintiff's motion for a preliminary injunction continuing reimbursement is denied.

So ordered.

5. There is also some suggestion that plaintiff no longer has Lyme disease, but suffers from persistent symptoms. The Plan, however, does not contemplate the treatment of symptoms alone in such an instance. (*See* Morin Decl. Ex. E; Tr. of Jan. 25, 2000 at 26–28).