Cook v. Liberty Life Assur. Co.          CV-00-408-B    01/15/02

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Kathleen Cook**

    **v.**                                   Civil No. 00-408-B
                                          Opinion No. 2002 DNH 017
**Liberty Life Assurance
Company of Boston**


### MEMORANDUM AND ORDER

Plaintiff Kathleen Cook was employed by Lockheed Sanders, Inc. ("Sanders"), and was a participant in the Sanders Long Term Disability Plan ("the Plan"). For nearly three-and-one-half years, Cook received long-term disability benefits under the Plan. In October 1998, defendant Liberty Life Assurance Company of Boston ("Liberty"), the Plan's insurer and administrator, terminated her benefits. Cook filed an administrative appeal with Liberty, but Liberty confirmed its decision in May 2000. Cook subsequently sued Liberty in Hillsborough County Superior Court, Liberty removed the action to this court on grounds of Employee Retirement Income Security Act ("ERISA") preemption, see Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 67 (1987), and

Cook has agreed that I should construe her complaint as a claim for benefits under ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Although only Liberty has filed a motion for summary judgment, the parties concur that the lawfulness of Liberty's termination decision is ripe for disposition on the administrative record. I agree and, for the reasons that follow, deny Liberty's motion.

**I.**

Cook, who has a bachelor's degree in business and a masters degree in business administration, joined Sanders as a program control administrator on July 11, 1983. Cook was a Plan participant and Liberty was the Plan's insurer and administrator at all relevant times. The group disability income policy underlying the Plan entitles a participant to benefits only if she submits "satisfactory proof" that she is disabled. The policy does not elaborate on the meaning of this phrase except to say that "[p]roof of continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to Liberty within 30 days of the request for the proof," and that "[t]he proof must cover, when applicable: (i) the date

-2-

Disability or Partial Disability started; (ii) the cause of Disability or Partial Disability; and (iii) the degree of Disability or Partial Disability." The policy gives Liberty the right, at its own expense and as often as is reasonably required, "to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice." The policy also states: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."

For the first 24 months of coverage, the policy regards a participant as "disabled" if she is "unable to perform all of the material and substantial duties of [her] occupation on an Active Employment basis because of an Injury or Sickness." After 24 months of benefits have been paid, an employee is considered "disabled" only if she is "unable to perform, with reasonable continuity, all of the material and substantial duties of [her] own or any other occupation for which [she] is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."

-3-

In February 1995, Cook filed a claim for short term disability benefits under a different employee benefit plan sponsored by Liberty. The claim form reported that Cook was suffering from Chronic Fatigue Syndrome ("CFS"), and had not worked since late fall, 1994. Dr. W. Stewart Blackwood, Cook's attending physician, attached to the claim form an Attending Physician's Statement of Disability ("APSD"), which indicated that he had first seen Cook in April 1994; had been seeing her monthly; had last seen her on February 3, 1995; and was scheduled to see her again on March 3, 1995. Dr. Blackwood stated that, because of her CFS, Cook was at that time totally disabled from her own or any occupation. He also wrote "Unknown" next to a boilerplate inquiry as to when Cook should be able to return to work.

Cook remained disabled throughout the 22 weeks of coverage provided by the short-term disability policy under which she was collecting benefits. During that time, Cook continued to see Dr. Blackwood and also began seeing Dr. Irina Barkan, a biochemist experienced in treating CFS. The medical evidence reveals that Cook continued to suffer from CFS; had an elevated Epstein-Barr Virus ("EBV") titre (at least at times); had asthma, allergies,

and a compromised immune system, all of which were aggravated by her poorly ventilated work environment; and was being treated with dietary and behavioral modifications, vitamins, and rest.

On April 20, 1995, around the time her short term disability benefits expired, Cook applied for long-term disability benefits under the Plan. Cook claimed that she was disabled from her prior work because of "severe fatigue" and EBV. In support of her application, Dr. Blackwood gave Cook a Class 5 ("Severe limitation of functional capacity; incapable of minimum activity") physical impairment rating. On May 8, 1995, Liberty approved Cook's application.

From May 1995 to March 1997, Liberty paid Cook long term disability benefits. Meanwhile, in November 1996, the Social Security Administration rejected Cook's initial claim for disability benefits, and Dr. Blackwood informed Liberty that, in addition to CFS, Cook also suffered from fibromyalgia. In March 1997, Liberty informed Cook that, as of April 4, 1997, she would need to demonstrate a total disability from any occupation in order to continue receiving benefits. Liberty contemporaneously sent letters to Drs. Blackwood and Barkan requesting recent office notes and diagnostic tests, and that they complete

physical capacities and restrictions forms.  Dr. Barkan did not

respond, but Dr. Blackwood's physical capacities and restrictions

form, delivered in early April 1997, indicated that Cook was

suffering from CFS, had to avoid working in excess of 40 hours

per week, and had to have a one-hour lunch break and two fifteen

minute breaks per day.[1]  At around this same time, Dr. Blackwood

completed at least two medical certificates setting forth these

same restrictions.[2]

On April 24, 1997, Cook informed Liberty that she had

returned to work on April 14, 1997.  But on May 6, 1997, Cook

informed Liberty that, as of the previous day, Dr. Blackwood had

pulled her out of work because she had a severe reaction to an

infected tooth and her immune system could not handle the

infection.  Liberty subsequently asked Dr. Blackwood to provide

it with an update on Cook's clinical status and work capacity.

Dr. Blackwood responded that Cook was unable to work because of a

---

[1]In the three years prior to becoming disabled, Cook
regularly worked 50-60 hour weeks, often without breaks.

[2]The record contains an undated medical certificate, which
was received by Liberty on May 8, 1997, wherein Dr. Blackwood
authorized Cook to return to work as of April 14, 1997.  The
record also contains a medical certificate dated March 24, 1997
authorizing Cook to return to work as of April 3, 1997.

recurrence of CFS, and provided Liberty with a copy of a May 5, 1997 office note in which he opined that Cook was showing symptoms of depression. Meanwhile, in May 1997, Liberty learned that Cook recently had been doing some work as a real estate agent. The record reflects that, by late June 1997, Cook had improved, that she believed herself capable of part-time work, and that Dr. Blackwood concurred so long as Cook did not return to the same work environment and thus trigger her asthma and allergies.

On July 2, 1997, Liberty requested information from Bob Kelliher Realty concerning Cook's employment as a real estate agent. Kelliher responded that Cook had had one closing and had earned $175.02, that she was not putting in any desk time, but that she was doing "occasional open houses, showings, and [answering] customer phone calls." Liberty and Cook subsequently had conversations wherein Cook acknowledged that she recently had been doing part-time work as a real estate agent, that she was only doing as much work as her body allowed, that she was making less than 20% of her pre-disability income, and that she was thinking of doing census work, which would allow her to set her own hours and schedule.

In November 1997, Dr. Blackwood sent Liberty copies of recent office notes pertaining to Cook, as well as an updated APSD. In the APSD, Dr. Blackwood opined that Cook then had a Class 4 ("Moderate limitation of functional capacity; capable of clerical/administrative activity') physical impairment and a Class 3 ("able to engage in only limited stressful situations and engage only in limited interpersonal relations (moderate limitations)") mental/nervous impairment. Liberty nonetheless continued to pay Cook benefits.

On June 24, 1998, Cook, with Liberty's assistance, received a fully favorable disability decision from the Social Security Administration. In July 1998, Liberty asked Dr. Blackwood for his office notes and diagnostic tests from December 1997 forward. Liberty also asked Cook to complete a supplementary statement and activities questionnaire so as to evaluate her continued eligibility for benefits. Both complied with Liberty's requests. In the questionnaire, Cook did not mention her real estate work in response to a question asking if she had returned to any type of employment, and replied "Don't know" to a question asking whether she anticipated a return to work in the future. For reasons that are not explained in the record, Dr. Blackwood

included with his response a copy of the March 24, 1997 medical certificate authorizing Cook to return to work in April 1997.

On August 18, 1998, Liberty wrote to Dr. Blackwood and asked whether, based upon his last examination of Cook, Cook's current restrictions and limitations remained the same as those listed on the March 24, 1997 medical certificate (a 40 hour work week with a daily one-hour lunch break and two daily fifteen minute breaks) he had recently sent to Liberty. Dr. Blackwood wrote back and answered "yes." Liberty subsequently asked Carol S. Vroman, a vocational expert, to conduct a vocational disability review based on Dr. Blackwood's answer to its August 18, 1998 letter. Unsurprisingly, Vroman concluded, in a report dated October 14, 1998, that there were a host of jobs that a person with Cook's educational background could perform with the restrictions noted on the March 24, 1997 certificate. On October 16, 1998, Liberty wrote Cook and informed her that it was terminating her benefits, effective October 31, 1998, on the basis of Dr. Blackwood's response to Liberty's August 18, 1998 letter and Vroman's October 14, 1998 vocational assessment. In that same letter, Liberty also asked Cook to pay it back $44,731.13 it became entitled to offset because of Cook's retroactive social security award.

On October 26, 1998, Dr. Blackwood wrote to Liberty and explained that his "yes" answer to the question posed in Liberty's August 18, 1998 letter had been based upon a misunderstanding:

> With reference to the letter you sent on August 18, 1998, requesting an update on Ms. Cook's limitations and physical capacities form. I mistakenly thought your letter was referring to my disability form completed on May 5, 1997 which indicated that she was out of work indefinitely. Subsequent to that, I had written a letter on March 23, 1998 to an Attorney McNeil, indicating that based on my last examination, I did not think that Ms. Cook was medical [sic] able to return to full time activity. The reasons were that she finds regular hours exhausting, also has a difficult time dealing with stress, sitting for long periods of time. She also has fatigue after doing any normal activities and [sic] makes it difficult to see how she can maintain a regular job as she would have to be out of work intermittently to recover and could not sustain the continuity required to do any reasonable job.
>
> Because of the updated disability letters and the information extending into 1998, I did not appreciate that your letter was referring back to my note of March, 1997 which was merely a trial base return to work which as my notes were [sic] clearly not successful.
>
> At this time, it is my opinion that Ms. Cook is not able to perform with any reasonable continuity the material and potential duties of her job or any similar occupation for which her training and experience would have otherwise been reasonable for her. I apologize if my prior note was unclear but as you can understand there have [sic] been a lot of paperwork for this

-10-

particular lady and things have progressed along [sic] way since March, 1997.

On November 5, 1998, Dr. Blackwood wrote a follow-up letter opining that Cook also was suffering from a "totally disabling" severe and chronic asthma. On this same date, Cook also filed with Liberty an internal appeal challenging the termination decision. On April 12, 1999, Liberty denied Cook's appeal, stating that "the additional medical information submitted by Dr. Blackwood . . . does not support limitations that would render you incapable of performing the material and substantial duties of any occupation." The denial letter also referenced Vroman's October 14, 1998 vocational assessment by way of explanation.

Cook subsequently retained counsel, who wrote Liberty and requested an independent review of the termination decision. Several letters were exchanged, but by letter dated May 22, 2000, Liberty stood by its termination decision. Again, Liberty referenced Vroman's October 14, 1998 vocational assessment in explaining its decision to confirm the termination of Cook's benefits. This proceeding ensued.

## II.

Cook's complaint, which I construe as a claim for benefits pursuant to ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), asserts, <u>inter alia</u>, an entitlement to benefits from October 31, 1998 to the present. The primary thrust of Cook's pleading is that Liberty acted inequitably in basing its decision to terminate her benefits on Dr. Blackwood's mistaken response to Liberty's August 18, 1998 letter, and the vocational assessment predicated upon that mistaken response. As set forth above, only Liberty has moved for summary judgment, but the parties agree, correctly, that the lawfulness of Liberty's decision to terminate Cook's benefits is now ripe for review.

Because the Plan reserves to Liberty the discretion to interpret and apply its terms, I must be circumspect in reviewing Liberty's decision to terminate Cook's benefits. <u>See, e.g.</u>, <u>Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.</u>, 230 F.3d 415, 418 (1st Cir. 2000) (noting that, in the situation just described, deference to the plan administrator's decisions is required under <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)). The First Circuit has variously described the applicable standard of review in a case such as this as one

-12-

requiring deference unless the decision was "arbitrary and capricious," "unreasonable," and/or an "abuse of discretion," see id. at 418-19 (parsing Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181 (1st Cir. 1998) and Doe v. Travelers Ins. Co., 167 F.3d 53 (1st Cir. 1999)). But the Circuit has distanced itself from previous implications that there may be substantive differences between and among these standards. See id.

In any event, it is apparent that Liberty's termination decision cannot stand if, in reaching it, Liberty ignored a material factor deserving significant weight, relied upon an improper factor, or seriously erred in weighing the proper factors. See, e.g., I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) (describing the ways in which an abuse of discretion can occur).

## III.

In its summary judgment motion, Liberty argues that I must enter judgment in its favor if it reasonably determined that, after October 31, 1998, Cook did not provide it with "sufficient proof that she continued to be incapable of performing the material and substantial duties of any occupation for which she

was reasonably fitted." Motion for Summary Judgment at 24. However, Liberty did not terminate Cook's benefits on this basis. Rather, in each letter explaining its termination decision, Liberty noted that it was Dr. Blackwood's affirmative answer to its August 18, 1998 letter (which asked Dr. Blackwood if he regarded as still applicable the limitations set forth on his March 24, 1997 medical certificate), and Vroman's October 14, 1998 vocational assessment (which was entirely premised on the limitations set forth in the March 24, 1997 medical certificate), which grounded its decision to terminate benefits.

The obvious flaw in Liberty's reasoning is that it overlooks the fact that Dr. Blackwood informed Liberty shortly after it terminated Cook's benefits that it could not rely on either his March 24, 1997 medical certificate or his response to Liberty's August 18, 1998 letter because neither document reflected his views concerning Cook's ability to work. Liberty cannot simply ignore Dr. Blackwood's assertion that he erred in his response to the August 18, 1998 letter and continue to base its termination decision on his allegedly erroneous response. Moreover, Liberty has failed to point to any other evidence to contradict the medical evidence that Cook produced to support her disability

-14-

claim.  Under these circumstances, Liberty's decision to terminate Cook's benefits based on Dr. Blackwood's response to the  August 18, 1998 letter was an abuse of its discretion.

## IV.

As Liberty suggests, it may well have had adequate grounds for it to terminate Cook's benefits on or before October 31, 1998.  I have no occasion here, however, to review decisions that Liberty never made.  Accordingly, I deny Liberty's motion for summary judgment [document no. 8].  On or before February 7, 2002, the parties shall file either a proposed final judgment setting forth the specific benefits owed Cook under the Plan, or a joint motion for a status conference detailing the issues precluding the entry of final judgment in this matter.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 15, 2001

cc:  Ronald E. Cook, Esq.
     William D. Pandolph, Esq.

-15-