**Thomas M. CONRAD, Plaintiff**

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY, Defendant**

**No. CIV.A.02–11123–GAO.**

United States District Court, D. Massachusetts.

Oct. 31, 2003.

Stephen Dibble, Mittelhozer, Ferrini & Dibble, PLLC, Newmarket, NH, Paul B. Kleinman, Gould & Sheridan, Londonderry, NH, for Plaintiff.

Corey Belobrow, Reliance Standard Life Insurance, Manchester, NH, Gary N. Stewart, Macioci, Fisher & Stewart, Newport, RI, for Defendant.

*MEMORANDUM AND ORDER*

O'TOOLE, District Judge.

Thomas M. Conrad has brought suit against Reliance Standard Life Insurance Company ("Reliance") to challenge its decision to deny his claim for long-term disability benefits. Conrad was a beneficiary under an insurance policy issued by Reliance to NitroMed, Inc. ("NitroMed"), Conrad's former employer. Because the policy was part of an employee welfare benefit plan, it is governed by the Employment Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Under ERISA, a beneficiary has the right to seek review of an insurer's decision to deny a claim for benefits in this Court. *See* 29 U.S.C. § 1132(a)(1)(B). Reliance now moves for summary judgment on the matter. After careful review of the briefs, the administrative record, and the policy itself, and after oral argument, Reliance's motion is DENIED.

## A. *Summary of Facts*

Conrad's physical ailments began in 1976 when he sustained an injury to his lower back while serving in the United States Marine Corps. His medical records show that he underwent surgery in 1989 related to his back injury and that he has been receiving treatment for his back since 1976.

In 1999, Conrad became the Director of Regulatory Affairs for a drug company called NitroMed. As an employee of NitroMed, he became a participant in an employee benefit plan ("Plan") administered by Reliance. Conrad worked full time at NitroMed until October 2000, when he took a leave of absence because of his lower back pain. The pain he had been experiencing was exacerbated after lifting a pallet in his driveway. R. at RSL 00449. During his leave, Conrad began various treatment regimens, including physical therapy and pain medication, in an effort to reduce and manage the pain. In August 2001, he was officially terminated from NitroMed because of his inability to return to work after extended medical leave.

During his period of leave from NitroMed, Conrad applied for disability payments from Reliance. In support of his claim, Dr. Deborah Shih, one of Conrad's treating physicians, described his condition as "low back pain/sciatica" and noted that he suffered L4–S1 fusion and degenerative disc disease. R. at RSL 00608. She described his symptoms as "lumbar back pain, left leg and foot pain." *Id.* Dr. Shih further stated that Conrad could stand for 1 to 3 hours per day, and that he could sit for 5 to 8 hours per day. R. at RSL 00609. She noted, however, that Conrad "is only able to stand and work for a short period of time, [less than] 1/2 hour at a time." *Id.* She also indicated that she believed Conrad had achieved maximum medical improvement, and that he was "not able to return to his current position [and] fulfill the objectives of his work." *Id.*

To help determine whether Conrad qualified as disabled under its policy, Reliance forwarded Conrad's medical records to an independent medical examiner, Dr. William Scott Hauptman. Dr. Hauptman did not conduct his own physical examination of Conrad; rather, he reviewed the notes and reports of the various physicians who had treated Conrad. So far as appears, his report is based entirely on this review. R. at RSL 00502–09.

On July 20, 2001, Reliance informed Conrad that it had determined that his "medical records do not support a finding of Total Disability under your policy." R. at RSL 00074. Conrad appealed the decision. Reliance allowed Conrad to submit additional information concerning his physical and mental health. R. at RSL 00070. In addition, Reliance asked Dr. Hauptman to conduct a second review of all of the records Conrad had submitted to date. R. at RSL 00198–205.

On December 31, 2001, Reliance affirmed its original decision. In its letter to Conrad, Reliance stated that it was "unable to substantiate the presence of a physical or mental condition which would prevent [Conrad] from performing the material duties of his occupation on a full time basis as of the date he ceased work and throughout the Elimination Period." R. at RSL 00032. This renewed finding that Conrad was not totally disabled was final, and Reliance informed him that he had exhausted his administrative remedies.

## B. *Definition of "Total Disability" Under the Plan*

Under the Plan, any employee who suffers 90 days of "Total Disability" is entitled to monthly payments of "60% of Covered Monthly Earnings." R. at RSL

00004. The Plan also contains the following definition:

"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;

    (1) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

    (2) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

R. at RSL 00007. The "Elimination Period" is ninety "consecutive days of Total Disability." R. at RSL 00004, RSL 00006.

The Plan's definition of "Total Disability" is peculiar because it includes beneficiaries who only have a "partial" or "residual" disability. In subparagraph (1), the Plan establishes that a person who becomes partially disabled after the Elimination Period qualifies as totally disabled. Similarly, in subparagraph (2), the Plan establishes that a person who is partially disabled during the elimination period also meets the requirements for total disability. While it is puzzling that the Plan would use such complicated verbiage to establish that the same benefits will be awarded whether a person is totally or partially disabled, this seems to be the straightforward meaning of the language cited above. *See also Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir.1994) (under ERISA, "ambiguous terms should be strictly construed against the insurer"). At oral argument, Reliance conceded that the Court's reading of the provision was correct. Therefore, to establish a valid claim for benefits, Conrad must show either: (1) that he is unable to perform some of the material duties of his occupation, or (2) that he is unable to perform the material duties of his occupation on a full-time basis.

## C. *Standard of Review*

    The first step in examining Reliance's decision to deny Conrad's claim is to identify the proper standard of review. It is well established that a denial of disability benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When there is such a grant of authority to the insurer, the Court must limit its inquiry to whether the insurer's decision was arbitrary and capricious. *See Diaz v. Seafarers Int'l Union*, 13 F.3d 454, 456 (1st Cir.1994). The parties here agree that the Plan granted Reliance the authority to determine eligibility and to construe the policy's terms and that the *de novo* standard does not apply. R. at RSL 00010 (setting forth that Reliance "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits").

The disagreement between the parties centers instead on whether the arbitrary and capricious standard should be "heightened." This dispute grows out of a comment that the Supreme Court made in *Firestone Tire*, when it announced that a deferential standard of review is appropri-

ate when a trustee exercises its discretion in deciding whether to grant or deny an application for benefit payments. The Court stated that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire*, 489 U.S. at 115, 109 S.Ct. 948 (citation and quotation omitted). There is disagreement among the circuits as to whether and how this "opaque direction" by the Supreme Court affects the arbitrary and capricious standard. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378, 384–86 (3d Cir.2000) (summarizing various approaches taken by different circuits).

Conrad argues that because his policy is both administered and funded by Reliance, the company is acting under a conflict of interest, so that the arbitrary and capricious standard should be heightened. Specifically, he points to a recent appellate decision that adopted a "sliding scale" approach to the standard of review in ERISA benefit denial cases. *Pinto*, 214 F.3d at 392. Under this approach, a court must increase its scrutiny of the insurer's decision depending on the degree to which it believes the insurer's partiality played a role in the outcome. *See id.* at 392–93.

■ The First Circuit, however, has taken a slightly different approach to the Supreme Court's admonition that a conflict of interest should be a "factor" in the ERISA review process. In *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999), the court held that when the party responsible for determining whether a claim should be paid is also the party who will fund the payments, a court must measure whether the denial was reasonable. The court explained:

> It seems to us that the requirement that [the insurer's] decision be "reasonable" is the basic touchstone in a case of this

kind and that fine gradations in phrasing are as likely to complicate as to refine the standard. The essential requirement of reasonableness has substantial bite itself where, as here, we are concerned with a specific treatment decision based on medical criteria and not some broad issue of public policy. Any reviewing court is going to be aware that in the large, payment of claims costs [the insurer] money. At the same time, the policy amply warns beneficiaries that [the insurer] retains reasonable discretion based on medical considerations.

*Id.* at 57. This elucidation in *Doe* was not intended to replace or alter the arbitrary and capricious standard. *See Pari–Fasano v. ITT Hartford Life and Accident Ins. Co.*, 230 F.3d 415, 419 (1st Cir.2000). Instead, the First Circuit "intended merely to recognize that, in order to find that an insurer had abused its discretion under the contract, [a court] would have to conclude that the insurer's eligibility determination was unreasonable in light of the information available to it. In other words, an unreasonable determination would necessarily constitute an abuse of discretion, and a reasonable determination necessarily would not." *Id.* at 419. In sum, in this circuit, evidence of conflict should be taken into account as a factor in determining "whether the insurer's decision [has] strayed outside the bounds of reasonableness to become an abuse of discretion." *Id.*

## D. *The Reasonableness of Reliance's Decision*

■ A careful review of the administrative record reveals that Reliance reached its decision to reject Conrad's claim in an unreasonable, and thus arbitrary and capricious, manner. The central problem with the decision is its heavy dependence on the two reports produced by Dr. Haupt-

man, based on his review of the records of Conrad's treating and examining physicians. While it was reasonable for Reliance to rely on a medical examiner's review of Conrad's records, the reports Dr. Hauptman generated betray a palpable bias in favor of rejecting the claim. Repeatedly, Dr. Hauptman's conclusions select for emphasis just one or two elements of a medical report, while ignoring additional facts and important context. Although it would certainly be permissible for a reviewer such as Dr. Hauptman to summarize or condense the findings of other doctors, it was incumbent on him to do so in an even-handed and fair-minded manner, and it is clear that he did not.

Several examples illustrate Dr. Hauptman's willingness to ignore factors favorable to the claimant while taking negative factors out of context and emphasizing them. In his first report, Dr. Hauptman's conclusions are based almost exclusively on the most optimistic data available. For instance, he devotes several paragraphs of his report detailing the psychiatric treatment Conrad has been receiving from Dr. Neil Weiser. He notes that Conrad suffers from depression and post traumatic stress disorder, and that he is taking several medications to treat those conditions. However, the final paragraph of this section of the report reads as follows:

I reviewed the final psychiatric visit available for review from April 25, 2001. Records note that the patient was helping his children at home. The patient complained of decreased concentration on work projects secondary to pain and pain medications. *However the record documents that the patient was looking into doing consulting work. This clearly indicates that the patient felt capable of continuing to work from a cognitive point of view.* The psychiatrist noted that the patient was feeling depressed approximately one month ago about leaving his job but since then his

mood was better. It is unclear from the medical records exactly when the patient stopped working. The psychiatrist noted that the patient will be getting nerve blocks.

R. at RSL 00502 (emphasis in original). Dr. Hauptman thus uses bold face type and underlining to give prominence to his unfavorable interpretations, at the same time subordinating other of the treating psychiatrist's reported observations and conclusions. Dr. Hauptman indicates that he regarded Conrad's statement that he was looking into doing consulting work to be the most important piece of information from Dr. Weiser's notes. R. at RSL 00478.

A similar imbalance is seen in Dr. Hauptman's discussion of Conrad's back condition. Dr. Hauptman recites that Conrad's symptoms are "consistent with degenerative [disc] disease," that he experiences muscle spasms, and that he has been receiving intrathecal injections of pain medication. R. at RSL 00502–03. He also mentions that a neurosurgeon who had examined Conrad gave him three options for treating his condition: a morphine pump, surgery, or pain medication through the Pain Clinic. R. at RSL 00503. Nevertheless, Dr. Hauptman focuses on a single physical examination in which Conrad's gait and reflexes were normal. *Id.* Based on this he concludes that **"there is nothing on the physical examination that would be consistent with impairment."** *Id.* (emphasis in original). Arguably, Dr. Hauptman's statement could be understood to assert only that a particular physical examination produced no evidence of an impairment. However, Dr. Hauptman's use of bold face type indicates that he meant to make a broader point. Moreover, the use of typographic emphasis suggests Dr. Hauptman's approach was that of an advocate speaking to persuade, rath-

er than a medical professional seeking to evaluate.

Dr. Hauptman's bias against Conrad's claim is even more evident in his second report. It appears that he took the occasion not to re-evaluate his prior conclusions but rather to defend them. For example, Dr. Hauptman indicates that he has reviewed a consultation that Conrad had with Dr. James Sarni at the Leahy Clinic Spine Center. Dr. Hauptman quotes Dr. Sarni's report as noting that "the patient is in a relatively active program now and is able to do various leg presses and toe presses as well as a mat program of exercises." R. at RSL 00201. But this is the only genuinely optimistic statement Dr. Sarni makes in the "Assessment" portion of his report. In context, the statement sounds quite different:

ASSESSMENT: The patient has chronic pain syndrome, status post fusion.

I had a long discussion with the patient, informing him that in my opinion, he would benefit from a comprehensive team approach, in which an anesthesiologist, a physical therapist trained in functional restoration type program, and a pain psychologist would work together on a regular basis in conference on a regular basis.

The patient is on Methadone, which is a very powerful narcotic medication and generally out of proportion to any type of non-neuropathic back pain.

We discussed the use of medications such as Methadone can reset the pain threshold in the long run be counterproductive and is certainly counterproductive in attempting to find the etiology of the pain.

Therefore, I believe the patient would need such a team approach in which he would be weaned off the narcotic medication and start on a functional based rehabilitation program. It is worth noting the patient is in a relatively active program now and is able to do various leg presses and toe presses, as well as a mat program of exercises.

Unfortunately, I am unaware of such a comprehensive pain program approach here in the Lahey Clinic system. . . .

There is little more I can offer this patient.

R. at RSL 00385. Additionally, earlier in his report, Dr. Sarni notes that Conrad "is presently taking Methadone, as well as Neurontin, Prozac, and Wellbutrin, all to help with the pain. He has had three epidural injections, which he states have not helped at all." R. at RSL 00384. He also notes that Conrad "ambulates using a cane" and that "he has had several falls because of episodes of sharp pain in the left lower extremity." *Id.* A full and fair reading of Dr. Sarni's physical examination and assessment of Conrad paints a very different picture of Conrad's condition than the excerpt Dr. Hauptman elects to quote in his report.

Another striking distortion is Dr. Hauptman's interpretation of a July 5, 2001, letter that Dr. Joanne Oh sent to Dr. Shih. Dr. Hauptman summarizes the letter as follows:

Dr. Oh noted that the patient was able to drive. Dr. Oh noted that the patient found that any significant amount of walking whether it is in a mall or to the post office can aggravate his ongoing symptoms. Therefore the records document that the patient had been able to walk in the mall, albeit with a self reported increase in his symptoms.

R. at RSL 00203. Again, a review of the full letter by Dr. Oh reveals a very different picture. Regarding Conrad's ability to drive the letter says:

As you know, this is a 44–year–old gentleman with failed back syndrome, with persistent back and left leg pain. We have done caudal epidural steroid injec-

tion with transient relief. He had been on Oxycontin. However with this medication, although it helped some with pain, he had side effects of grogginess, so we have switched him to a Fentanyl patch. With initial use of this medication, he had some groggy side effects. He also noted when he was wearing the patch while driving, and the sun was radiating to the area of the patch site, he had some increased sleepiness potentially related to increased release of the medication.

R. at RSL 00239. The evident thrust of this paragraph is that the doctors are trying to adjust Conrad's pain medication to help eliminate various side effects, including sleepiness while driving. Dr. Hauptman unfairly draws out only the fact that Conrad has been driving his car. Similarly, the letter's discussion about Conrad's ability to walk is quite different from what one might expect based on Dr. Hauptman's report. The letter reads:

> [Conrad] has also noted some intermittent right leg pain. However, this is more muscular in nature, and maybe [sic] due to preferential ambulation on this leg. He is at this time interested in certain assistive modalities, such as utilization of a scooter, as he finds that any significant amount of walking whether it is in a mall or to the post office can aggravate his ongoing symptoms.

*Id.* This statement does not support the conclusion that Conrad successfully walks around in the mall. Instead, it reports that when Conrad has tried to do so, he has suffered an aggravation of his back pain, and that he would prefer to use a scooter in such situations.

Dr. Hauptman's two reports leave the impression of an examiner who has embarked on his investigation determined to find evidence that Conrad is not in as much pain, either physically or mentally, as he claims to be. This is at odds with the tenor of the medical records. There is no suggestion that any of the numerous doctors who treated Conrad doubted that he had a serious condition and that he was suffering a considerable amount of pain. The record clearly shows that they prescribed potent pain medication, explored surgical options, and recommended a course of physical therapy. Since Dr. Hauptman's assessment of Conrad's condition relies exclusively on the medical reports of these doctors, it is difficult to understand how he could have arrived at such dramatically different conclusions from those of the treating physicians unless his vision was obscured by some underlying bias. Dr. Hauptman repeatedly focuses on only one or two sentences or facts, and he appears unwilling to recognize or point out the context in which those statements were made. For Reliance to base its benefits decision on such tendentious reports was unreasonable. *See also Davidson v. Kemper Nat'l Servs., Inc.*, 231 F.Supp.2d 446, 453 (W.D.Va.2002) (if insurer relies only on those portions of the treating physician's report that best support denial of claim, insurer is acting in bad faith).

Reliance's resolution of Conrad's claim was also unreasonable because it failed to adequately investigate his ability to carry out the material duties of his regular occupation. As noted above, under the Plan, Conrad qualifies for benefits if he is unable to perform some of the "material duties of his/her regular occupation." R. at RSL 00007. While Reliance has considerable discretion to determine what those material duties are, its vocational experts only examined whether Conrad was capable of doing sedentary work, and did not examine his ability to do any specific tasks required by the job Conrad held.

To establish Conrad's ability to perform the duties of his occupation, Reliance for-

warded Dr. Shih's assessment of Conrad's condition to an in-house staff of vocational experts. R. at RSL 00175–83. These experts then determined the proper classification of Conrad's occupation according to the Department of Labor's Dictionary of Occupational Titles ("DOT"). In this case, a Vocational Rehabilitation Coordinator ("VOC") classified Conrad's job as "Director, Quality Assurance," a position which, in turn, is classified as "light work." R. at RSL 00179–82. Using the DOT's description, the VOC found that Dr. Shih's assessment that Conrad's ability to stand, sit, walk, and lift showed that Conrad "is capable of performing his own occupation." R. at RSL 00177. From the Coordinator's report it is clear that he limited his inquiry to whether Conrad had the physical ability to do sedentary work, and there was no attempt to evaluate whether Conrad had the mental acuity necessary for his job. The DOT's description of the responsibilities of a "Director, Quality Assurance" includes the ability to "Analyze[ ], evaluate[ ], and present[ ] information concerning factors, such as business situations, production capabilities, manufacturing problems, economic trends, and design and development of new products for consideration by other members of management team." R. at RSL 00180.

When Conrad appealed Reliance's first decision to reject his claim, he asked Reliance to provide him with the occupational description of his classification as a "Director, Quality Assurance." R. at RSL 00071. In response, Reliance asked its vocational department to reevaluate whether this was an appropriate DOT as-

signment. John Zurick, a Vocational Rehabilitation Specialist, determined that it would be more accurate to classify Conrad's regular occupation as comparable to that of "Director, Research and Development" or "Project Director." R. at RSL 00169–75. However, Reliance ultimately determined that this change in occupational assignments was irrelevant because both "Director, Research and Development" and "Project Director" were sedentary in nature, just as "Director, Quality Assurance" was. R. at RSL 00032. The record shows no effort to evaluate Conrad's ability to perform any of the specific tasks the Labor Department assigns to these occupations.[1]

While Reliance's initial failure to evaluate Conrad's ability to perform the material duties of his regular occupation beyond his ability to sit, stand, and lift objects might be understandable when Dr. Shih's brief assessment of these abilities was the only information available, much more information was available when Reliance reclassified Conrad's occupation. At that point, Reliance had a copy of Conrad's entire medical file, and Dr. Hauptman had issued his first report. Among other things, the medical records showed that Conrad was consistently being administered high doses of potent pain medications. With this fuller picture of Conrad's physical condition available, it was unreasonable for Reliance to limit its inquiry into Conrad's ability to perform his job by whether he could sit, stand, and walk for sufficient periods of time. *See also* 29 U.S.C. § 1133(2) (after rejecting a claim

---

1. In its brief in support of summary judgment, Reliance states that the conclusion of the Vocational Review conducted by Zurick was that Conrad was capable of performing his own occupation. *See Def.'s Mem. of Law in Support of Summ.J.* at 5–6 (docket no. 11). However, a review of the administrative record indicates that only the VOC who initially reviewed Conrad's application reached that conclusion. R. at RSL 00177. Zurick, on the other hand, only opines as to the correct classification of Conrad's occupation, and makes no new evaluation of Conrad's ability to perform his job based on this reclassification. R. at RSL 00169.

for benefits, insurer must afford a claimant "a full and fair review"); *Dorsey v. Provident Life and Accident Ins. Co.*, 167 F.Supp.2d 846, 854–57 (E.D.Pa.2001) (insurer's decision arbitrary and capricious in part because it relied on a vocational review that did not take into account all of the responsibilities of insured's job). Certainly it was key for Conrad to perform his job to be able to engage in complex thinking and analysis for several hours a day. These aspects of his job were made known to the claims examiner. R. at RSL 00126 (notes of interview with Conrad); R. at RSL 00215 (copy of NitroMed job description). Nowhere in any of the reports by the occupational experts or in either of Dr. Hauptman's two reports is there an explicit discussion of whether Conrad was able to perform these aspects of his position. The failure of Reliance's experts to make an assessment of the impact of Conrad's medication on central requirements of Conrad's regular occupation further supports the conclusion that the decision to reject Conrad's disability claim was unreasonable.

Finally, Reliance's argument that Conrad conceded that he was physically capable of performing his former job at NitroMed is not persuasive. In support of this argument, Reliance cites to a letter that Conrad's attorney wrote to Reliance in connection with Conrad's appeal of Reliance's initial decision. In the letter, the attorney states, "We agree that Dr. Conrad can stand, sit, walk and carry with sufficient ability to handle the minimal physical challenges of the sedentary occupation of regulatory affairs director." R. at RSL 00072. However, as just discussed, the fact that Conrad could stand, sit, and walk, is not the end of the inquiry. As Conrad's attorney went on to explain, a genuine investigation of Conrad's ability to do his job would have included an examination of whether he could "anticipate and solve complex and weighty problems in an efficient manner" despite his back pain and his heavy use of pain medication.

### E. *Conclusion*

On the record presented, it is the Court's conclusion that Reliance's decision to reject Conrad's claim for long-term disability benefits was unreasonable. Under the terms of the plan, Conrad was entitled to payment so long as he could show that he was unable to perform some of the material duties of his regular occupation. The administrative record shows that Reliance failed to make an evenhanded assessment of his physical and mental health, and it made only a cursory evaluation of Conrad's ability to work. Reliance never genuinely examined whether, in light of his physical condition and treatment regimen, Conrad could perform all of the material duties of his job. Accordingly, Reliance's motion for summary judgment is DENIED.

The plaintiff did not move for judgment. In light of the determinations made herein, the Court invites the parties to submit their views as to whether it would be appropriate to enter judgment in favor of the plaintiff.

It is SO ORDERED.