Igor GUNN, Plaintiff,

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY, et al., Defendants.**

No. CV 04–01852 FMC(MANx).

United States District Court, C.D. California.

Oct. 31, 2005.

Glenn R. Kantor, Gruber and Kantor, for Plaintiff.

Colleen R. Smith, Harrington Foxx Dubrow & Canter, Los Angeles, CA, Allison M. Dibley, Jackson Lewis, San Francisco, CA, for Defendants.

## ORDER ON ADMINISTRATIVE REVIEW

COOPER, District Judge.

This matter is before the Court on administrative review. The Court has reviewed the parties' briefs and the administrative record. As explained herein, the Court reviews the administrative decision *de novo* and concludes that Plaintiff is entitled to benefits under the Plan.

### I. INTRODUCTION

Plaintiff appeals the defendant insurer's termination of long-term disability benefits.

### II. FACTUAL AND PROCEDURAL BACKGROUND

In 2001, Plaintiff Igor Gunn ("Gunn") was employed by UBS/Paine Webber

("PW") as a financial advisor. At the time, PW participated in a long-term disability ("LTD") plan ("the Plan") which was administered by defendant Reliance Standard Life Insurance Co. ("Reliance"). Administrative Record ("AR") at 1.

The summary plan description ("SPD") sets forth a description of a limitation on benefits provided for periods of disability related to mental or nervous disorders:

> Monthly benefits for total disability due to mental or nervous disorders will not be payable for more than 24 months unless you are in a hospital or institution at the end of the 24–month period.

Chandler Decl., Ex. A at 17.

The policy of insurance also sets forth a description of a limitation on benefits as well:

> Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless you are in a Hospital or Institution at the end of the twenty-four (24) month period.

AR at 19. "Mental or Nervous Disorders" is defined by the policy as including "depressive disorders". AR at 19.

Both the SPD and the policy reserve the authority to interpret the provisions of the Plan to the administrator.[1]

Gunn began experiencing health problems in early 2001. On February 29, 2001, Gunn was seen in the emergency room of Cedars–Sinai Medical Center. AR at 466. His diagnosis was "severe anxiety disorder with catatonia, now resolved." AR at 467. The attending physician noted that Gunn had "a history of anxiety disorder," but also noted that Gunn had "a recent concern for diagnosis of multiple sclerosis for which the patient is scheduled to see a neurologist . . . ." AR at 466.

On July 20, 2001, Gunn filed an application for LTD disability benefits under the plan. AR at 125. Gunn claimed he was unable to work due to "periodic fainting spells, constant dizziness, *MS symptoms,* fatigue, balance difficulties, cognitive difficulties, depression." AR at 125 (emphasis added). With the claim, Gunn's physician, Dr. Cho, submitted a physician's statement. AR at 440–41. She indicated that Gunn's diagnosis was MS. AR at 440. Under "findings", she noted: "double vision, balance, depression, dizziness and fatigue." AR at 440. She noted referrals for neurology and psychiatry. AR at 440.

Reliance approved Gunn's claim in November 2001 and began providing disability benefits. AR at 112. In the letter notifying him of the approved claim, Reliance informed Gunn that he would be eligible for benefits after twenty-four months of disability only if he were "totally disabled from performing the material duties of Any Occupation."[2] AR at 112. Reli-

---

1. The SPD provides:
   > The Plan Administrator . . . has the sole discretion and authority to apply, construe, and interpret all provisions of each of the Plans, to grant or deny all claims for benefits, and to determine all benefit eligibility issues.

   Chandler Errata Decl. at 216. Similarly, the policy provides:
   > Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy

   and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits.
   AR at 12.

2. The Reliance Policy defines a person as "totally disabled" if he cannot perform the material duties of his "regular occupation." AR at 9. This definition applies for only two years. After two years of receiving disability benefits, the person is considered totally dis-

ance notified Gunn that before the expiration of the twenty-fourth month (i.e., before August 2003), it would conduct an investigation to determine his continued eligibility for benefits. AR at 112. Reliance also informed Gunn that he could find a more detailed description of his policy in the "LTD certificate of group insurance." AR at 112.

An April 1, 2002, report from Dr. Gross, Gunn's psychiatrist, reveals Dr. Gross' opinion that Gunn is totally disabled from any work because

> he cannot sustain attention or alertness to complete simple tasks without rest period. He is clinically depressed and slowed mentally and physically. He is prone to dizziness and difficulty maintaining balance.

AR 50–51. Dr. Gross noted a possible connection between Gunn's symptoms of depression and his MS diagnosis:

> It is not clear ... whether there is a direct neurological connection between the psychiatric symptoms and the multiple sclerosis for this patient. Statistical data show increased rates of unipolar and bipolar depression in multiple sclerosis patients compared with the general population. Some medications, especially steroids and interferon can cause emotional symptoms. Cognitive loss, fatigue and sexual dysfunction are common to both pure depression and to multiple sclerosis.

AR at 50.

On the same date, April 1, 2002, Dr. Gross filled out a mental impairment questionnaire. AR at 741. He noted that Gunn had MS and "mood and thinking difficulty." He stated that Gunn's prognosis was "extremely guarded", while noting

that Gunn's MS "contribute[d] to mental picture and is chronic." AR at 743.

On April 24, 2002, Reliance sent inquiries to three of Gunn's doctors—neurologist Dr. Ronald Andiman (AR at 69), internist Dr. Cho (AR at 67), and psychologist Dr. Susan Diskin (AR at 71). The inquiries asked for help in "clarifying [Gunn]'s current medical status." *See, e.g.*, AR at 67. The inquiries were similar to those made by Reliance prior to its November 2001 decision to grant Gunn's disability claim. *See, e.g.*, AR at 78.

Dr. Diskin responded,[3] providing information on a Reliance form entitled "Physician's Report Psychiatric". AR at 314–15. Dr. Diskin opined that Gunn showed marked impairment in activities of daily living, social functioning, concentration, and adaptation to stressful conditions. AR at 315. She noted that he suffered from dizziness, nausea, balance difficulties, and fatigue. AR at 315. The form asks the physician if the impairment was caused primarily by any organic conditions; she indicated: "yes—multiple sclerosis." AR at 315.

On February 24, 2003, an internal document in the record reveals that Reliance was considering an investigation into whether Gunn was subject to the mental disorder limitation. AR at 106 ("[I]t appears [claimant] could [return to work] from physical standpoint.... Recommend updating Medical Records on file[.] Need to determine what is [primary diagnosis]—physical (MS) or Mental (depression).")

On April 16, 2003, as the two-year anniversary of Gunn's initial LTD claim approached, Reliance informed Gunn that it was reviewing his case. AR at 55–56. The company reminded Gunn that as of

---

abled only if he cannot perform the material duties of "any occupation." *Id.*

3. Drs. Cho and Andiman also appear to have responded, but their responses consisted of treatment notes without narrative or conclusions. AR at 317–34, 349–91.

August 28, 2003, he would be eligible for continued benefits only if he were "disabled from performing the material duties of any occupation given [his] medical condition and vocational background." AR at 55. The company informed Gunn that it intended to "evaluate [his] ability to perform another occupation," and asked that Gunn complete a questionnaire. AR at 55. Despite the February 24, 2003, document regarding the intention to assess Gunn's claim vis-à-vis the mental disorder limitation, the letter does not inform Gunn that Reliance would be examining whether his disability was related to depression. *Compare* AR at 106 *with* AR at 55–56.

Gunn returned a completed questionnaire in May 2003. Gunn wrote that he was prevented from working by "fatigue, dizziness, balancing difficulties [and] depression." AR at 53. He listed his doctors as Cho, Diskin and Gross. AR at 53.

In an undated report that was written some time after March 2003, Gunn's psychologist, Dr. Diskin, expressed the opinion that Gunn was completely disabled on both medical and psychological grounds. AR at 313. She noted certain symptoms of MS from which Gunn was suffering during January to March 2003: "numbness in one extremity, . . . one incident of fainting, . . . [d]izziness[, and] nausea." AR at 313. Dr. Diskin also noted a link between Gunn's physical symptoms of MS and his psychological distress:

> Unfortunately, such an exacerbated profile of symptoms confronts Mr. Gunn with his continuing physical vulnerability, inducing feelings of renewed helplessness, hopelessness, and anxiety over a possibly degenerative progression for the future.

AR at 313.

In July 2003, Reliance referred Gunn for an independent examination ("IME") by United Review Services. AR at 241. Reliance sought the examination to determine if Gunn's impairment was "secondary to MS, depression or neither." AR at 246.

Dr. Carl Orfuss conducted the exam in August 2003, and at that time conducted an extensive medical file review. *See* AR at 220–29. Dr. Orfuss noted subjective symptoms reported by Gunn as "difficulty coordinating his lower extremities, . . . frequent spasms in the lower extremities[,] . . . and sluggish mentation." AR at 221. Dr. Orfuss also noted the presence in the medical records of a "typed list of symptoms" that appeared to have been prepared by Gunn. AR at 224. With that list, Gunn complained of the following symptoms: depression, dizziness, bladder control problems, somnolence, fatigue, facial pain, decreased coordination and attention span, decreased memory and judgment, difficulty solving problems, blurred vision, shaking hands, chest pain, sweating, and balance problems. AR at 224.

Dr. Orfuss noted that that Gunn suffered from depression for several years prior to his diagnosis of MS in 2001. AR at 221. He noted that Gunn was diagnosed with MS before he saw a neurologist, and that "[r]etrospective symptoms" of MS were "dizziness and intermittent imbalance." AR at 228. Without explanation (other than to note Gunn's history of depression as predating the diagnosis of MS), Dr. Orfuss concluded that Gunn was "temporarily totally disabled at the present time with 99% of his disability stemming from his psychiatric problems." AR at 228. Dr. Orfuss explained his conclusion by applauding the efforts of other MS patients who continue to work despite their symptoms:

> To certify disability of Mr. Gunn due to his multiple sclerosis at this time would serve as a grave injustice to those thousands of patients with MS with far more frequent exacerbations and far more significant symptomatology than he manifests who continue working and with

motivation to remain as productive as possible for as long as possible. I do not quibble with the fact that he has been certified as disabled at this time. In fact, I fully agree with this, but I would attribute his disability ... to the psychiatric problems and not to the multiple sclerosis.

AR at 228. Dr. Orfuss' assessed Gunn's physical impairment as limited to a mild gait instability that could be mitigated with an assistive gait device such as a cane. AR at 228–29.

On September 10, 2003, Reliance wrote a letter to Gunn which informed him that he would no longer receive LTD benefits. AR at 36–39. Noting Dr. Orfuss' analysis, Reliance concluded that Gunn was "without a physical impairment which would prevent a return to work." AR at 37. Reliance stated that Gunn's inability to work was caused by a mental disorder. AR at 37 ("This information documents you are without a physical impairment."). Reliance noted that, as a result, the mental or nervous disorder limitation applied, and he was no longer entitled to benefits under the Plan. AR at 37.

Gunn filed an appeal of the decision. *Id.* at 530. In support of the appeal, Gunn submitted an October 27, 2003, report from Dr. David Brandes.[4] AR at 583–87. Dr. Brandes diagnosed Gunn as suffering from relapsing-remitting multiple sclerosis, severe depression, fatigue secondary to MS, and cognitive dysfunction secondary to MS and/or severe depression. AR at 586. He concluded that Gunn was totally disabled as a result of his MS:

At this point in time, I feel that the patient is totally disabled as a result of his multiple sclerosis, due to his cognitive dysfunction, and fatigue, both of these will preclude inability [*sic*] to work under any situation.

Furthermore, he does have some impairment of balance, heat intolerance, and neurogenic bladder symptoms, which further add to his disability. However, the main cause of the disability is the MS related fatigue and cognitive dysfunction.

AR at 586–87.

On February 26, 2004, Reliance requested another review, this time by Dr. William Hauptman.[5] Reliance asked Dr.

4. Reliance criticizes Gunn's selection of Dr. Brandes, implying that Gunn shopped for a more favorable opinion than that offered by his previous neurologist, Dr. Andiman. Reliance points to handwritten notes in the record from one of Gunn's doctors (it is not clear from which), which states that "a neurologist says his problem re work 'psychiatric' and refused to continue disability." AR at 746. Someone (again, it is not clear who) interlineated on these notes the name "Andiman." AR at 746.

Dr. Andiman, for his part, has submitted a declaration that disavows ever having expressed the opinion that Gunn's disability was only psychiatric in nature and states that he did not ever refuse to certify Gunn's disability. Ordinarily, the court may not consider evidence outside the administrative record; the only exception to that rule does not apply here. *See infra* note 5.

Here, the admission of Dr. Andiman's declaration is not necessary. The notation in one doctor's treating notes of another doctor's conclusions is of limited probative value. Dr. Andiman's opinion, as reported by him, regarding the nature of Gunn's disability is not part of the record. For that reason, the Court does not consider the opinion of Dr. Andiman, whatever that opinion might be.

5. Dr. Hauptman's deposition is part of the record. Ordinarily, on administrative review, the Court does not consider extrinsic evidence; however, the Court may consider evidence outside the administrative record where the evidence is offered as proof of a conflict of interest. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976–77 (9th Cir. 1999).

Reliance is the only insurance company for whom Dr. Hauptman works, and he derives approximately one-third of his income from

Hauptman specifically to "review [and] advise if MS alone is impairing." AR at 550.

Dr. Hauptman conducted a medical file review but did not examine Gunn. AR at 532. He noted that the medical records documented diagnoses of MS and "significant psychiatric disease including depression." AR at 532. He also noted that "[r]ecords document complaints of severe fatigue and cognitive deficits ascribed to both MS and depression." AR at 545–46. Ultimately, however, he concluded that Dr. Orfuss' assessment (that 99% of Gunn's disability was due to depression) was "consistent with the entirety of the medical records." AR at 546. He noted that the "[m]edical records clearly document consistently severe psychiatric illness characterized as severe depression." AR at 546. He contrasted Gunn's psychiatric illness with his physical illness: "[T]he patient's multiple sclerosis is characterized by his neurologist, Dr. Brandes as mild." AR at 546. Dr. Hauptman also observed that "medical records document a correlation between the patient's level of severity of depression and response to psychiatric medication, with his subsequent level of fatigue." AR at 546.

Reliance denied Gunn's appeal in a March 11, 2004, letter to Gunn. AR at 524. Reliance cited the analyses of Dr. Hauptman and Dr. Orfuss, as well as the notes from Gunn's physicians, in upholding its initial termination of benefits. AR at 526–27.

After Reliance denied the appeal in March 2004, Gunn filed the present action.

## III. ERISA PLANS

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001—1461, regulates certain employee benefit plans, including employee welfare benefit plans such as the long-term disability plan at issue in this action. 29 U.S.C. § 1002(1), (3); § 1003(a). ERISA requires that employee benefit plans "be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The instrument must provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan. *Id.*

Beneficiaries who seek benefits due under an ERISA plan must first seek relief with the plan administrator. *Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 724 (9th Cir.2000). After the beneficiary has exhausted this remedy, he may file a civil action. 29 U.S.C. § 1132(a)(1)(B).

## IV. ISSUES PRESENTED ON ADMINISTRATIVE REVIEW

In connection with the present administrative review, the Court must decide three issues before proceeding to its review of the administrative decision: First, the Court must determine whether the SPD is a valid summary plan description under ERISA. Next, the Court must ap-

---

his work with Reliance. Hauptman Depo. (attached to the Chandler Decl. as Ex. C) at 20, 32. Reliance prohibits Dr. Hauptman from contacting a beneficiary's treating physicians to discuss those physicians' opinions unless he first receives permission from Reliance. Hauptman Depo. at 37.

In 2003, Hauptman was criticized by the District of Massachusetts in a published opin-

ion for an obvious bias in favor of rejecting a claim for LTD benefits. Reliance's sole response to this criticism was to note its agreement with Dr. Hauptman's suggestion that he stop using bold-faced type in certain areas because that was perceived by the Massachusetts court as evidence of bias. Hauptman Depo at 42.

ply one of two contradictory clauses relating to "mental or nervous disorders". In connection with that analysis, the Court must determine whether there are ambiguities in the applicable limitation. Finally, the Court must determine the applicable standard of review.

## V. Validity of Summary Plan Description

■ Gunn has submitted a PW document entitled "Disability Plan," which he contends is a valid SPD within the meaning of 29 U.S.C. § 1022. *See* Chandler Decl., Ex. A. He argues that the SPD governs his eligibility for LTD benefits. *See Bergt v. Retirement Plan for Pilots Employed by Markair, Inc.,* 293 F.3d 1139, 1143 (9th Cir.2002) (holding that a valid SPD is part of the ERISA plan). Reliance argues that the SPD is not a valid plan summary plan description under either 29 U.S.C. § 1022(b) or the relevant regulations.[6]

In order to constitute a valid SPD for LTD benefits, § 1022(b) requires that a summary contain certain information, including the name and address of the plan administrator, the source of financing for the plan and the identity of any organization through which benefits are provided, and the remedies available for the redress of denied or partially denied claims. 29 U.S.C. § 1022(b).

The SPD at issue does not set forth this information. *See* Chandler Decl., Ex. A. However, the SPD refers beneficiaries to another booklet for "further information about filing or appealing a claim and [the] rights [of] plan participant[s]." *Id.* at 25; *see* Chandler Errata Decl. at 209–19.

That booklet contains the remaining required information. *Id.* at 215–217. Therefore, the SPD and the referenced booklet, taken together, constitute a valid plan summary under 29 U.S.C. § 1022(b).

## VI. Standard of Review

■ A plan administrator is presumed to have no discretion to interpret the terms of an ERISA plan; therefore, the administrator bears the burden of showing that the plan unambiguously confers such discretion on the administrator. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir.1999) (*en banc*), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). Where that burden is met, the administrator's denial of benefits is reviewed for abuse of discretion under the "arbitrary and capricious" standard of review. *Abatie v. Alta Health & Life Ins. Co.,* 421 F.3d 1053, 1059 (9th Cir.2005); *Kearney,* 175 F.3d at 1088–89.

■ Nevertheless, even if the burden is met, if the plan administrator is also the insurer, a different standard of review may apply because the plan administrator's fiduciary duty may be affected by financial self interest. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976 (9th Cir.1999). Stated otherwise, where the plan administrator is the insurer, an apparent conflict of interest arises. *Id.*

■ Although this apparent conflict of interest is insufficient to alter the standard of review, where the beneficiary presents "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fi-

---

**6.** By addressing this argument, the Court does not mean to imply that where a summary plan description that fails to meet one or more of the technical requirements of 29 U.S.C. § 1022(b), it is not binding on an ERISA plan. The SPD is the document that must be provided to participants and benefi-

ciaries, and they justifiably rely on the SPD as a statement of their rights under an ERISA plan. 29 U.S.C. § 1022(a); *see also Bergt,* 293 F.3d at 1143 (noting that the SPD is the "primary source of information regarding employment benefits" for participants and beneficiaries).

duciary obligations to the beneficiary, . . . a rebuttable presumption arises in favor of the participant" and the administrator's decision will be reviewed under the less rigid *de novo* standard. *Id.* (internal quotation marks and citations omitted).

■ Once the beneficiary raises this presumption, the administrator bears the burden of rebutting it by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits. *Id.* (internal quotation marks and citation omitted). If the plan fails to carry this burden, courts review *de novo* the decision to deny benefits. *Id.* (citations omitted)

■ Because both the SPD and the policy reserve to the administrator the authority to interpret the provisions of the Plan, there is an apparent conflict of interest in the administrator's decision to deny benefits. Therefore, Gunn must present evidence ("beyond the mere fact of the apparent conflict") that tends to show that Reliance acted in its own self interest. Here, Gunn has done so in at least two ways.

First, Gunn has presented evidence that Reliance misrepresented the nature of its investigation into his continuing eligibility for benefits. On February 24, 2003, Reliance was considering an investigation into whether Gunn was subject to the mental disorder limitation. AR at 106. However, Gunn was not informed of this in the letter to him regarding his continuing eligibility for LTD benefits; instead, the letter Reliance requested additional medical information in order for Reliance to assess his "ability to perform another occupation." AR at 55.

This information provided to Gunn and his doctors the incentive to show the ex-

tent of his impairment, but provided no incentive to them to provide an assessment regarding the cause of that impairment— i.e., whether his impairment was due to his MS, his depression, or both. This initially deprived Gunn of the ability to have his doctors focus on this distinction.[7] However, Reliance was not deprived of this same opportunity, and in fact posed the question to its doctors in more precise terms: "Please clarify if impairment is secondary to MS, depression or neither." AR at 246 (to Dr. Orfuss). "Please review [and] advise if MS alone is impairing." AR at 550 (to Dr. Hauptman).

Gunn's evidence that Reliance made a misrepresentation in the April 2003 letter is probative evidence that tends to show that Reliance acted in its own self interest in deciding to terminate Gunn's LTD benefits.

■ Second, Gunn has presented evidence that Reliance exhibited bias when it selected Dr. Hauptman to conduct a medical review of his file, notwithstanding its knowledge of the criticism Dr. Hauptman's practices received in *Conrad v. Reliance Standard Life Insurance Co.*, 292 F.Supp.2d 233 (D.Mass.2003). In that case, the court found that Reliance's decision to deny LTD benefits was arbitrary and capricious because the decision was "heav[il]y dependen[t] on . . . two reports produced by Dr. Hauptman" that "betray[ed] a palpable bias in favor of rejecting the claim." *Id.* at 237–38. The court noted that Dr. Hauptman highlighted in bold-face type and underlining—presumably for Reliance's benefit—those passages in his reports that favored a denial of benefits. Such highlighting, the court noted, "suggest[ed that] Dr. Hauptman's approach was that of an advocate speaking to persuade, rather than a medical profes-

---

**7.** After the initial denial letter was sent, Gunn was informed that the termination of his benefits was based on this limitation, and he was

able to focus medical evidence on the relevant question of causation.

sional seeking to evaluate." *Id.* at 238–39. The court also took issue with what it described as Dr. Hauptman's willingness to "repeatedly focus[ ] on only one or two sentences or facts" and his unwillingness "to recognize or point out the context in which those statements were made." *Id.* at 240. The court concluded that it was unreasonable (and therefore arbitrary and capricious) "[f]or Reliance to base its decision on such tendentious reports." *Id.*

The District of Massachusetts court's criticism of Dr. Hauptman is not relevant to the substance of his analysis of Gunn's impairment in this action.[8] Rather, this criticism is illuminating with respect to Reliance's actions—or lack thereof—in response to that criticism. *Conrad* gave notice to Reliance of Dr. Hauptman's practices with respect to providing analyses regarding the insured's degrees of impairment. Here, Reliance continued to engage the services of Dr. Hauptman without attempting to correct the perceived bias. Indeed, the only response to the criticism was Reliance's agreement with Dr. Haupt-

man's suggestion that he stop highlighting in bold-face type (and underlining) the passages in his report that most justified a denial of a claim. Concentrating on form only, this response did nothing to address the *substance* of the court's criticism.

The *Conrad* court's criticism focused on the fact that Dr. Hauptman appeared to be a man with a mission—to find a way to justify a denial of benefits. *See id.* at 239 ("Dr. Hauptman's two reports leave the impression of an examiner who has embarked on his investigation determined to find evidence that [the beneficiary] is not in as much pain, either physically or mentally, as he claims to be."). Here, Reliance set Dr. Hauptman off on a new mission, informing him that Gunn's "claim had been paid for [the] duration of [the] policy on psych," and asking him to "please review [Gunn's medical records and] advise if MS alone is impairing." AR at 550.

Gunn's evidence that Reliance continued to rely on Dr. Hauptman's analysis after the *Conrad* court's criticism without ad-

---

**8.** The Court notes, however, that there is some evidence in the record in this action that suggests that Dr. Hauptman is still willing to base his conclusions "almost exclusively on the most optimistic data available." *Conrad,* 292 F.Supp.2d at 238. For example, in justifying his conclusion, Dr. Hauptman contrasts Gunn's history of "severe depression" with his "mild" MS. AR at 546. However, Dr. Hauptman chose to quote a passing notation of a diagnosis of "mild" relapsing-remitting multiple sclerosis found in a treatment note from Gunn's follow-up visit to Dr. Brandes, rather than an extensive discussion by Dr. Brandes regarding the nature and cause of Gunn's impairment found in the "Comprehensive Neurological Evaluation." *Compare* AR 583–87 (Dr. Brandes' October 27, 2003, "Comprehensive Neurological Evaluation" that states that Gunn was "totally disabled as a result of his multiple sclerosis") *and* AR at 538 (Dr. Hauptman's report, noting his review of Dr. Brandes' October 27 report and his treatment notes from December 23, 2003) *with* AR at 619 (Dr. Brandes' December

23 treatment note regarding Gunn's diagnosis: "RRMS—mild") *and* AR at 546 (Dr. Hauptman's report, justifying his conclusion that Gunn's MS is not disabling by referring to the December 23 treatment note but making no mention of the October 27 comprehensive report).

Additionally, Dr. Hauptman was not specifically asked to comment on the opinion offered by the doctor performing the IME. *See* AR at 550. Nevertheless, Dr. Hauptman emphatically stated that "[i]t is [his] opinion within a reasonable degree of medical certainty that the evaluation, analysis and conclusion as set forth by Dr. Orfuss are consistent with the entirety of the medical records." AR at 546. Although this ringing endorsement alone is not damning evidence, when viewed in light of the *Conrad* court's criticism, the other example noted above, and the fact that only Dr. Orfuss' and Dr. Hauptman's reports express the opinion that Gunn's MS is only 1% impairing, the seemingly unsolicited opinion that emphatically endorses the insurer's IME becomes suspect.

dressing the substance of the Court's criticism is probative evidence that tends to show that Reliance acted in its own self interest in deciding to terminate Gunn's LTD benefits.

Gunn's evidence is sufficient to raise a rebuttable presumption that Reliance acted to protect its own self interest. Reliance has failed to rebut this presumption. Accordingly, the Court applies the *de novo* standard of review to the decision to deny benefits.

### VII. Ambiguities In and Contradictions Between the SPD and the Policy

■ Where a court applies the *de novo* standard of review, and where the terms of an ERISA plan are ambiguous, they are construed in favor of the beneficiary. *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.;* 125 F.3d 794, 799 (9th Cir.1997).[9] This rule draws its roots from the presumption in insurance law that ambiguities in insurance policies are construed against the insurance company, which drafted the policy. *Id.; Barnes v. Independent Auto. Dealers Ass'n of California Health and Welfare Benefit Plan,* 64 F.3d 1389, 1393 (9th Cir. 1995).

■ This rationale also supports another, similar rule: When the terms of a plan document conflict with the SPD, the terms that favor the beneficiary generally apply. *Bergt,* 293 F.3d at 1145 (holding that a contradiction between the master plan document and the SPD created an ambiguity as to whether a plaintiff was eligible to participate in a retirement plan). The Ninth Circuit has determined that the

"'burden of uncertainty created by careless or inaccurate drafting of the [SPD] must be placed on those who do the drafting.'" *Id.* at 1145 (quoting *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir.1991)). The Ninth Circuit noted that this rule, in addition to placing the burden on the party that is most able to bear it, has the side effect of encouraging accurate drafting of SPDs, the document that must be provided to beneficiaries:

> [T]he law should provide as strong an incentive as possible for employers to write the SPDs so that they are consistent with the ERISA plan master documents, a relatively simple task.

*Bergt,* 293 F.3d at 1145.

■ Here, the SPD and the policy use different language when referring to the limitation for periods of disability related to mental or nervous disorders. The SPD notes that the 24–month limitation applies to periods of disability "due to mental or nervous disorders"; the policy states that the limitation applies to periods of disability "caused by or contributed to by mental or nervous disorders."

The phrase "due to" is ambiguous in that it is susceptible to at least two meanings.[10] First, the phrase could be read to mean that the limitation applies only when the inability to work is *solely* the result of depression. However, the phrase could also be read more broadly, and the limitation could apply when neither a physical ailment nor a mental disorder is the sole cause of the inability to work; rather, it would apply when the physical ailment and the mental disorder together create the inability to work.

---

**9.** Where a court reviews under the arbitrary and capricious standard for abuse of discretion, the administrator's interpretation of the plan must be upheld if it is reasonable, and ambiguities need not necessarily be resolved in favor of the insured. *See Lang,* 125 F.3d at 799.

**10.** When language in an ERISA document susceptible to two different meanings, it is considered to be ambiguous. *Bergt,* 293 F.3d at 1143–44.

The phrase "caused by or contributed to by" is susceptible to the second meaning of "due to" as set forth above, but the phrase is not susceptible to the first meaning. By adding the phrase "or contributed to by" to "caused by", the drafters of the policy eliminated as a possible interpretation that the policy limitation applied only when the inability to work is solely the result of depression. Therefore, the Court concludes that the policy language conflicts with the SPD language.

Accordingly, the Court must apply the version of the limitation that is more favorable to the beneficiary. In this case, that version is contained within the SPD. In applying the limitation set forth in the SPD, the Court must also construe any ambiguities in favor of the beneficiary. Here, the twenty-fourth month limitation will not apply unless Gunn's inability to work is solely attributable to his depression. The Court therefore embarks upon a *de novo* review of the record to determine this fact.

## VIII. *De Novo* Review of Reliance's Termination of Benefits

When Gunn filed his initial claim in 2001, he and his physician reported symptoms of fainting, dizziness, double vision, balance difficulties, MS symptoms, depression, fatigue, and cognitive difficulties. When Reliance sent its initial approval letter, it did not notify Gunn that his claim had been approved subject to the twenty-four month "mental or nervous disorder" limitation.

From a review of the record, the Court determines that the weight of the evidence supports a conclusion that, as of May 2003, Gunn's impairment was not due solely to his depression. To the contrary, no doctor offers that opinion. Even Dr. Orfuss' opinion (with which Dr. Hauptman concurred) attributes at least 1% of Gunn's impairment to MS. In fact, the record also contains a good deal of evidence that supports the conclusion that Gunn's impairment is due solely to MS.

The evidence on the issue of the cause of Gunn's impairment comes down firmly on two sides—Gunn's doctors favoring his position and Reliance's doctors favoring its position. In the end, both the weight and the persuasiveness of the evidence favors Gunn's position. Gunn's doctors attributed his disability in whole or in part to his MS even before Gunn (or they) were aware that Reliance was considering whether the "mental or nervous disorder" limitation applied.[11] For this reason, the Court gives them additional weight.

The Brandes opinion, offered after Gunn was informed this limitation might apply,

---

11. Specifically, the record shows that before Gunn was informed that the "mental or nervous disorder" limitation applied, his doctors offered the following opinions:

In April 2002, Dr. Gross noted Gunn's impairment due to his inability to "sustain attention or alertness to complete simple tasks without rest period." Dr. Gross did not offer an opinion as to whether Gunn's MS or his depression was the cause of his impairment. Instead, Dr. Gross merely noted that it was possible that there was a "direct neurological connection" between Gunn's psychiatric symptoms and his MS or his many medications. He also stated that "MS contributes to mental picture."

Around that same time, Dr. Diskin noted symptoms of dizziness, nausea, balance difficulties, and fatigue. She opined that his impairment was caused by MS.

Again in connection with a review of his benefits, Gunn filled out a questionnaire in May 2003 in which he noted that his symptoms were fatigue, dizziness, balancing difficulties, and depression.

Around the same time (although it is not clear exactly when), Dr. Diskin offered the opinion that Gunn was totally disabled on both medical and psychological grounds.

articulates the conclusion more explicitly, but no less convincingly: In a comprehensive report, Dr. Brandes offered the opinion that Gunn was totally disabled due to MS, and his impairment was due mainly to his cognitive dysfunction and fatigue.

On the other hand, the IME doctor, Dr. Orfuss, a neurologist, offered the opinion that Gunn's disability was 99% attributable to his depression, but his explanation is not convincing,[12] and he failed to address any possible connection between MS and symptoms of depression. The report of Dr. Hauptman, which wholeheartedly endorsed Dr. Orfuss' conclusions, is of little probative value based on the deficiencies that are detailed in other parts of this Order.[13]

Accordingly, the Court determines that Gunn is entitled to benefits under the Plan notwithstanding the "mental or nervous disorder limitation." The evidence does not support the conclusion that his impairment was, at the time of the termination of LTD benefits, "due to a mental or nervous disorder."

## IX. CONCLUSION

For the reasons explained above, the Court, on administrative review, REVERSES the plan's decision to terminate Gunn's benefits under the Reliance Policy.

---

**12.** Dr. Orfuss notes but does not discuss in his analysis how Gunn's symptoms of dizziness, bladder control problems, facial pain, decreased coordination and attention span, decreased memory and judgment, difficulty solving problems, blurred vision, shaking hands, chest pain, sweating, and balance problems are attributable to depression. Additionally, his explanation of how Gunn's physical symptoms are not impairing (which consists of praise for MS patients who work notwithstanding MS symptoms) is unconvincing.

**13.** Dr. Hauptman notes a connection between Gunn's level of depression, his response to medication, and his level of fatigue, suggesting that Gunn's fatigue is related to his depression rather than his MS. This point is made elsewhere in the record as well. However, the weight of the evidence still strongly favors Gunn's entitlement to benefits.